UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO
ALBUQUERQUE DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 1:21-MJ-00121-SCY |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Albuquerque, New Mexico |
| | ) | |
| DEAN GROSS, | ) | Thursday, February 25, 2021 |
| | ) | |
| Defendant. | ) | (10:07 a.m. to 10:43 a.m.) |


PRELIMINARY EXAMINATION / DETENTION HEARING

BEFORE THE HONORABLE JOHN F. ROBBENHAAR,
UNITED STATES MAGISTRATE JUDGE


**APPEARANCES:**          See Page 2


U.S. Pretrial/Probation: M. Pirkovic


Court Reporter:          Recorded; ABQ Zoom


Clerk:          K. Hernandez de Sepulveda


Transcribed By:          Exceptional Reporting Services, Inc.
P.O. Box 8365
Corpus Christi, TX 78468
361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES**:


For Plaintiff:                    STEPHEN WHITE, ESQ.
                                  U.S. Attorney's Office
                                  District of New Mexico
                                  P.O. Box 607
                                  Albuquerque, NM 87103

For Defendant:                    BUCK T. GLANZ, ESQ.
                                  Federal Public Defender's Office
                                  111 Lomas Boulevard NW
                                  Suite 501
                                  Albuquerque, NM 87102

1                              INDEX

2    GOVERNMENT'S WITNESS      DIRECT    CROSS    REDIRECT   RECROSS

3    JIMMIE GLISSON              7        14        --        --

4

5    ARGUMENT RE PROBABLE CAUSE

6    BY MR. WHITE         16

7    BY MR. GLANZ         18

8

9    ARGUMENT RE DETENTION

10   BY MR. GLANZ         21

11   BY MR. WHITE         26

12

13

14   RULINGS OF COURT

15   RE PROBABLE CAUSE   19

16   RE DETENTION        28

17

18

19

20

21

22

23

24

25

4

<u>**Albuquerque, NM; Thursday, February 25, 2021; 10:07 a.m.**</u>

**<u>(Remote appearances)</u>**

**(Call to Order)**

**THE CLERK:**  *United States of America versus Dean Gross*, Cause Number 21-MJ-121-SCY.

**THE COURT:**  Good morning.  Would counsel for the United States please enter their appearance?

**MR. WHITE:**  Good morning, Your Honor, Stephen White for the United States.

**THE COURT:**  Good morning.

And counsel for Mr. Gross?

**MR. GLANZ:**  Good morning, Your Honor, Buck Glanz on behalf of Mr. Gross who's appearing via Zoom from Cibola County.

**THE COURT:**  All right, good morning, Mr. Gross.

**THE DEFENDANT:**  Good morning.

**THE COURT:**  Sir, you are here for your preliminary and detention hearings this morning.  Before we address those matters, let me discuss with you the fact that you're appearing by videoconference this morning.  Mr. Gross, you have the right to personally appear before the Court for these hearings. However, you can waive your personal presence.

On the screen before you, you should see in a moment a document entitled, "Waiver of Personal Presence at Hearing." Do you see that document, Mr. Gross?

1             THE DEFENDANT:  Yes, sir.

2             THE COURT:  Mr. Gross, I see a signature above the

3   Defendant's signature line.  Is that your signature on this

4   document?

5             THE DEFENDANT:  Yes, sir.

6             THE COURT:  Mr. Gross, did you sign this document

7   after you had a chance to read it?

8             THE DEFENDANT:  Yes, sir.

9             THE COURT:  And did you discuss it with your attorney

10  prior to signing it?

11            THE DEFENDANT:  I did, yes.

12            THE COURT:  Okay.  All right.  Mr. Gross, do you

13  understand if I approve this waiver, you'll be giving up your

14  right to personally appear before the Court for these hearings?

15            THE DEFENDANT:  Yes, sir.

16            THE COURT:  Is it your intent, Mr. Gross, to appear

17  by video?

18            THE DEFENDANT:  It's safer and better for everybody,

19  I think, right?

20            THE COURT:  I agree with you but I just need to make

21  sure that you understand --

22            THE DEFENDANT:  Yes, sir.

23            THE COURT:  -- your waiver.  Okay.

24            THE DEFENDANT:  Yes.

25            THE COURT:  Finally, Mr. Gross, did anyone force you

6

1   or threaten you to sign this document?

2            **THE DEFENDANT:**  Negative.  No, sir.

3            **THE COURT:**  All right.  I will approve the Waiver of

4   Personal Presence at Hearing and find that the Defendant has

5   knowingly and voluntarily waived his right to personally appear

6   before the Court for his preliminary and detention hearings

7   this morning.

8            All right.  So let's move to the preliminary hearing.

9            Mr. Glanz, how does your client wish to proceed

10   regarding the preliminary hearing?

11           **MR. GLANZ:**  Your Honor, he would like to have his

12   preliminary hearing.

13           **THE COURT:**  All right.  Mr. White, is the Government

14   prepared to proceed with the preliminary hearing?

15           **MR. WHITE:**  Yes, Your Honor.

16           **THE COURT:**  All right.  You may call your first

17   witness.

18           **MR. WHITE:**  The United States calls Deputy United

19   States Marshal Jimmie Glisson, Your Honor.

20           **THE COURT:**  All right.  Deputy, if you'd please be

21   sworn by my courtroom deputy.

22           **JIMMIE GLISSON, GOVERNMENT'S WITNESS, SWORN**

23           **THE CLERK:**  Thank you.

24           **THE COURT:**  You may proceed, Mr. White.

25   //

1                          **DIRECT EXAMINATION**

2    **BY MR. WHITE:**

3    Q    Can you please state your name for the record?

4    A    Jimmie Glisson.

5    Q    And where are you employed?

6    A    I'm a Deputy United States Marshal assigned to the

7    District of New Mexico Albuquerque.

8    Q    And how long have you worked in law enforcement?

9    A    Eighteen years.

10   Q    And are you the case agent on this case?

11   A    Yes.

12   Q    And are you familiar with the facts of this case?

13   A    Yes.

14   Q    What materials have you reviewed to familiarize yourself

15   with those facts?

16   A    I reviewed my report pertaining to the events of 23

17   January 2021 as well as the Criminal Complaint filed in Federal

18   court.

19   Q    And are you familiar with a man named Dean Gross?

20   A    Yes.

21   Q    And is he in the Zoom hearing with us today?

22   A    Yes.

23   Q    And can you please describe him?

24   A    Mr. Gross is a male.  Here and now he's wearing -- it

25   looks like a tan top with a white face mask in front of a

1  slightly burnt umber or orange background.

2              MR. WHITE:  Can the record please reflect that Deputy

3  Marshal Glisson has correctly identified Mr. Gross?

4              THE COURT:  Any objections?

5  BY MR. WHITE:

6  Q    Deputy Marshal Glisson, is it your belief --

7              THE COURT:  Mr. White, I asked Mr. Glanz if he had an

8  objection.

9              MR. WHITE:  Oh, I'm sorry.

10             THE COURT:  Mr. Glanz, any objection to

11  identification?

12             MR. GLANZ:  No, Your Honor.

13             THE COURT:  All right.  So noted.

14             Go ahead.

15             MR. WHITE:  My apologies, Your Honor.

16  BY MR. WHITE:

17  Q    Deputy Marshal Glisson, is it your belief that Mr. Gross

18  was involved in an event that occurred on January 23rd, 2021?

19  A    Yes.

20  Q    And where did that event occur?

21  A    That occurred at 3092 Rosendo Garcia Southwest in

22  Albuquerque, New Mexico.

23  Q    And did you and a team of Marshals with the Southwest

24  Investigative Fugitive Task Force, which is commonly called

25  "SWIFT," go to that address that day?

1  A    Yes, sir.

2  Q    And were you assisting elements of the New Mexico

3  Department of Corrections Security Threat Intelligence Unit,

4  commonly called, "STIU"?

5  A    Yes.

6  Q    And did the SWIFT and STIU members go to that address to

7  locate and apprehend a fugitive named Destiny Watkins?

8  A    Yes.

9  Q    Did the members of those two units go to that address

10 because they had received information that Destiny Watkins was,

11 in fact, at that address?

12 A    Yes.

13 Q    And upon arrival at that address, was there a house

14 located on the property?

15 A    Yes.

16 Q    Was there also a travel trailer located on the property?

17 A    Yes.

18 Q    And which of the two, the house or the trailer, did you go

19 to?

20 A    I was predominantly focusing -- or assisting at the travel

21 trailer.

22 Q    And when you were at the travel trailer, did a man

23 eventually open the door to the trailer?

24 A    Yes.

25 Q    And was that the man -- or was that man the Defendant you

```
                   Glisson - Direct / By Mr. White              10
```

1    had identified earlier, Mr. Dean Gross?

2    A    Yes.

3    Q    And was Mr. Gross cooperative or uncooperative?

4    A    Uncooperative.

5    Q    Did officers inform Mr. Gross that they were looking for a

6    fugitive named Destiny Watkins?

7    A    Yes, sir.

8    Q    Did Mr. Gross respond that he did not know Destiny

9    Watkins?

10        **THE COURT:**  Mr. White, I'm going to just interject.

11   It's extraordinarily leading.  Every question you're asking is

12   leading.  I know we're trying to move things along but maybe we

13   could try to at least do some direct examination.

14        **MR. WHITE:**  Okay.  Yes, Your Honor.

15   **BY MR. WHITE:**

16   Q    Can you please describe, Deputy Marshal Glisson, how your

17   interactions with Mr. Gross went?

18   A    The initial interactions were between STIU Agents Chris

19   Stanley and Arvin (phonetic) -- I'm probably saying his name

20   incorrectly -- Rhodes (phonetic).  They made contact with

21   Mr. Gross who was standing in the doorway of the trailer and

22   numerously identified why law enforcement was present, who we

23   were looking for and he consistently was uncooperative and

24   stated something to the effect, he did not know who Destiny

25   Watkins was.

1  Q    Did you or any of the officers ask if anybody else was in

2  the trailer?

3  A    The STIU officers did numerous times.

4  Q    And how did Mr. Gross respond?

5  A    He indicated there was no one else inside the trailer.

6  Q    Was that true or untrue?

7  A    That was untrue.

8  Q    How do you know that was untrue?

9  A    During the interactions with Mr. Gross, who was standing

10 inside the doorway, he would attempt to keep the door close to

11 his body.  However, from my position, I could see a couple

12 times there was someone else inside the trailer like just to

13 his immediate left.  And eventually Destiny Watkins did come

14 out of the trailer at a later time.

15 Q    And how was Mr. Gross positioning his body in the doorway?

16 A    He was positioning as if to obscure any attempt to view

17 into the trailer itself.

18 Q    Did Mr. Gross say anything else about your presence at his

19 travel trailer?

20 A    He was trying to indicate to us to go talk to his

21 grandmother and told us, you-all need to go -- he said

22 something to the effect, "You-all need to go talk to my

23 grandmother" and get us away from the trailer, I felt like.

24 Q    Did Mr. Gross later exit the travel trailer?

25 A    Yes, he did.

Glisson - Direct / By Mr. White                    12

1   Q    Did you speak with him at that point?

2   A    I encountered Mr. Gross shortly thereafter in between the

3   trailer -- yes, between the trailer and the primary residence.

4   Q    Did you tell him or advise him of anything during that

5   conversation?

6   A    Yes, sir, I did.  I identified myself as a Deputy United

7   States Marshal, specifically a Federal officer, and informed

8   him that -- again, reiterated why we were there, who we were

9   looking for and that -- advised that lying to a Federal officer

10  could be -- could result into a Federal offense.

11  Q    After you advised Mr. Gross of that, how did he keep -- or

12  how did he portray his knowledge of Destiny Watkins?

13  A    He continued to deny knowledge of Destiny Watkins.

14  Q    And was a person subsequently discovered in the travel

15  trailer that Mr. Gross had just come from?

16  A    Yes, sir.

17  Q    Was that person Destiny Watkins?

18  A    Yes, sir.

19  Q    Were any firearms located in the travel trailer?

20  A    It was reported to me later that after Destiny Watkins had

21  come out because she had been hiding and initially had not been

22  making contact with law enforcement that a protective sweep to

23  make sure no one else was hiding inside the trailer was done.

24        And it was reported to me that at least two firearms

25  were located in plain view inside the trailer.  They were not

Glisson - Direct / By Mr. White                    13

1    secured at that time after the place -- it was determined no

2    one else was inside the travel trailer.

3    Q    So based on your testimony, do you believe that Mr. Gross

4    knowingly lied to you about the whereabouts of Destiny Watkins?

5    A    Yes.

6    Q    And had officers or you believed that Mr. Gross -- excuse

7    me -- believed Mr. Gross that Destiny Watkins was not in the

8    travel trailer, could that have hindered the investigation into

9    her whereabouts?

10   A    Yes, sir.

11   Q    Just a few final questions, Deputy.  Is locating fugitives

12   a matter within the jurisdiction of the United States Marshal

13   Service?

14   A    Yes, sir.

15   Q    And does that sometimes include locating State fugitives

16   as part of the State -- or the SWIFT task force?

17   A    Yes, sir.

18   Q    And is the United States Marshal Service part of the

19   Executive Branch of the United States government?

20   A    Yes, sir.

21   Q    Okay.

22            **MR. WHITE:**  No further questions.  I pass the

23   witness.

24            **THE COURT:**  All right.  Any cross examination?

25            **MR. GLANZ:**  Yes, Your Honor, thank you.

1                          **CROSS EXAMINATION**

2  **BY MR. GLANZ:**

3  Q    Good morning, Deputy.

4  A    Good morning, sir.

5  Q    Now, you mentioned the first agents to speak with

6  Mr. Gross were STIU agents, you said?

7  A    Yes, sir.  They were the first ones that made contact.

8  They were -- as this was a STIU operation, they were taking

9  lead.  We were assisting.

10 Q    And so they were employees of the State government; is

11 that correct?

12 A    Yes, sir.

13 Q    Bernalillo County Sheriff's office or did you say

14 Department of Corrections?

15 A    New Mexico Department of Corrections Probation and Parole

16 Security Threat Investigation Unit, STIU, yes, sir, State

17 employees.

18 Q    Okay.  And you said that Mr. Gross was uncooperative but

19 he didn't make any threats or anything like that; did he?

20 A    No, sir, no threats that I'm aware of.

21 Q    Okay.  And when he came out of the trailer, you discussed

22 having interaction with him as he was walking to the other

23 house, I believe you said; is that correct?

24 A    Yes, sir.

25 Q    And at that time, you said you identified yourself as a

Glisson - Cross / By Mr. Glanz                          15

1   Federal agent and warned him that lying to you was a Federal

2   crime?

3   A     Yes, sir, to include displaying my credentials.

4   Q     And at that time, didn't he also tell you in actuality the

5   woman in the trailer's name was Divine?

6   A     Yes, he did.  May I expound?

7   Q     I -- go ahead.

8   A     While -- as he was getting ready to go talk to his

9   grandmother, I -- again, he at numerous times stated no one

10  else was in the trailer.  And then I asked him, "Well, who's in

11  the trailer?"  And he replied, "Divine."

12  Q     Okay.  So he did acknowledge there was a person in the

13  trailer after he had stated there wasn't?

14  A     Correct.

15  Q     And just -- I know you said you showed him your

16  credentials but what were you and the other members of the

17  SWIFT task force wearing during this?

18  A     I was wearing my -- an SU tactical vest that displayed

19  predominantly on the front and on the back "United States

20  Marshal" and "Police."

21  Q     Okay.  So this -- and were you wearing a mask or anything

22  like that?

23  A     Initially there I was not, no, because I was out and away

24  from people and we were spread out pretty far.

25  Q     Okay.

16

1          **MR. GLANZ:**  No further questions, Your Honor.

2          **THE COURT:**  All right.  Any redirect?

3          **MR. WHITE:**  No, Your Honor.

4          **THE COURT:**  All right.  Is there any reason that

5   Deputy Glisson should not be excused?

6          **MR. GLANZ:**  I have no further questions, Your Honor,

7   no reason for me.

8          **THE COURT:**  All right.  Thank you, Deputy.  You are

9   now excused.

10      **(Witness is excused)**

11          **THE COURT:**  Any further witnesses on behalf of the

12   United States?

13          **THE WITNESS:**  Thank you, Judge.

14          **MR. WHITE:**  No, Your Honor.

15          **THE COURT:**  All right.  Mr. Glanz, any evidence to be

16   presented by the Defense?

17          **MR. GLANZ:**  No, Your Honor, not with respect to the

18   preliminary hearing.

19          **THE COURT:**  All right.  With respect to probable

20   cause, is there any argument, Mr. White?

21          **MR. WHITE:**  Yes, I'd be happy to make argument, Your

22   Honor.  Especially because this is a fairly uncommon charge,

23   I'd be happy to go through the elements and describe how they

24   match Deputy Glisson's testimony if you would like me to.

25          **THE COURT:**  Please.

1          **MR. WHITE:**  So there's five elements to a charge for

2    making a false statement in violation of 18, United States

3    Code, 1001.  The first is that the Defendant made a false,

4    fictitious or fraudulent statement or representation to the

5    Government.  Deputy Glisson testified that the Defendant Dean

6    Gross stated that Destiny Watkins was not in his travel trailer

7    and it was later determined that she was.  So that first

8    element has been satisfied.

9          The second element is that the Defendant made the

10   statement knowing it was false.

11         And kind of related to that is the third element that

12   the Defendant made the statement willfully.  That means

13   deliberately, voluntarily and intentionally.  Deputy Glisson

14   testified that Mr. Gross' body language was of the type that it

15   looked as if he was trying to stop the officers from viewing

16   into the travel trailer and he also testified that Mr. Gross

17   was asking the officers to go look at the house and talk to his

18   grandmother which the Court can reasonably conclude meant that

19   Mr. Gross was trying to get them away from the travel trailer.

20         So the United States posits that Mr. Gross did make

21   the statement knowingly and entirely willfully and

22   deliberately.

23         The fourth element is that the statement was made in

24   a matter within the jurisdiction of the Executive, Legislative

25   or Judicial Branch of the United States.  Deputy Glisson

1   testified that as a member of the SWIFT task force, he is

2   charged with locating fugitives and that can sometimes include

3   State fugitives.  And he also testified that the U.S. Marshal

4   Service, which is the SWIFT task force or part of the SWIFT

5   task force, is a member of the Executive Branch of the United

6   States.  So the fourth element is satisfied.

7          And the fifth and final element is that the statement

8   was material to the United States Marshal Service in this case.

9   The definition of "material" is that a fact is material if it

10  has a natural tendency to influence or is capable of

11  influencing a decision of the United States Marshal Service and

12  Deputy Glisson testified that had the officers believed

13  Mr. Gross that Destiny Watkins was not in the travel trailer,

14  that could have hindered their investigation.  So it was a

15  material false statement.

16         So for these five -- or for these reasons, the United

17  States believes that all of the elements of the crime have been

18  met.

19         **THE COURT:**  All right, thank you.

20         Mr. Glanz, any argument regarding probable cause?

21         **MR. GLANZ:**  Yes, Your Honor, just briefly.  Your

22  Honor, as the deputy made clear, the initial agents which made

23  contact with Mr. Gross were not Federal employees.  So none of

24  the statements from Mr. Gross could form the basis of the

25  charge.

1          So what we're left with is the interaction between

2    the deputy and Mr. Gross as they're walking between the

3    trailer.  He did say that he asked Mr. Gross if Destiny Watkins

4    was in the trailer and he said no.  And then as he was walking

5    over to his Grandma's, he said, her name is Divine or something

6    to that.

7          So from the evidence presented to the Court, it's

8    just as logical to conclude that he did not believe Destiny

9    Watkins was in the trailer but Divine was in the trailer.  And

10   that was reflected in his response to the deputy.

11         So for those reasons, we'd ask the Court to find that

12   there is no probable cause based on the information presented

13   during this hearing.  Thank you.

14         **THE COURT:**  All right, thank you.

15         The Court will find probable cause.  It's -- as the

16   parties know, it's a standard that's significantly lower than

17   proof beyond a reasonable doubt.  And at this point, the

18   evidence certainly supports the fact that Deputy Glisson was

19   present at the scene to execute or at least to attempt to

20   locate a fugitive by the name of Destiny Watkins.

21         Contact was made by officers.  Deputy Glisson was

22   part of a task force or at least part of a group, a tactical

23   unit to effectuate that contact.  He was present during

24   conversations had with Mr. Gross at the door where Mr. Gross

25   consistently denied that another person was inside the trailer.

1           It is true that perhaps those statements at that time

2    were not made directly to Deputy Glisson but at this stage of

3    the game -- or this stage of the proceeding, I should say,

4    certainly probable -- hearsay is admissible and I would find

5    that he overheard those statements and the conversation made by

6    the Defendant and other agents or officers trying to contact

7    and locate Ms. Watkins.

8           The contact that Deputy Glisson subsequently had

9    while walking over to the house further indicates that

10   Mr. Gross first denied that someone was present and then

11   indicated that Divine was present.  But I don't think that

12   obviates probable cause.

13          The statements made by Mr. Gross under a probable

14   cause standard are knowingly false, willful and they're

15   certainly within the jurisdiction of -- well, Deputy Glisson

16   was operating within the jurisdiction of the Executive Branch

17   and the statements made by the Defendant were material.

18          So the Court will find probable cause has been

19   established by the Government at this stage and will bind these

20   matters for further proceedings.

21          All right.  We are here for a detention hearing as

22   well.  Mr. Glanz, how does your client wish to proceed on

23   detention?

24               **MR. GLANZ:**  He wishes to have a hearing, Your Honor.

25               **THE COURT:**  All right.  By hearing, do you wish to

1   present argument or evidence?

2          **MR. GLANZ:**  Argument and evidence by way of proffer.

3          **THE COURT:**  All right.  Let me just ask Mr. White.

4   To start, what's the Government's position regarding detention?

5          **MR. WHITE:**  We are requesting detention, Your Honor.

6          **THE COURT:**  All right.  Mr. Glanz, let's start with

7   your argument and evidence.  I'm happy to hear from you

8   regarding detention.

9          **MR. GLANZ:**  Thank you, Your Honor.  As an initial

10  matter, the weight of the evidence is a factor to consider and

11  that's also the nature of the charges alleged.  As Mr. White

12  acknowledges, this is a rather rare charge to be imposed.  In

13  looking at the offense level, it appears to carry an offense

14  level of 6.

15          In reviewing Mr. Gross' criminal history as

16  provided by background and also a search through Odyssey

17  New Mexico, I believe without being certain that he may fall in

18  a Criminal History Category III which means he would be facing

19  a potential sentence of two to eight months for these charges.

20  So as an initial matter, compared to the bulk of cases that

21  come through Federal court, this is a rather junior offense.

22          Additionally, beyond that, presumably one of the

23  State's primary concerns is the obstruction of justice prong,

24  an (f)(2).  I presume that's one of the reasons why they're

25  filing this or seeking detention.  However, as background did

22

1    confirm, Destiny Watkins is currently in State custody.  So

2    there's no question that he would be interacting with her.  She

3    appears to have an upcoming probation violation.

4           I did speak to the grandmother this morning.  She

5    says she's more than willing to be a third-party custodian of

6    him.  She said no one else resides with him.  She's 80 years

7    old and kind of sick.

8           And also, my client is very sick.  I did speak to the

9    grandmother about this, as did the probation officer who

10   conducted the report.  He suffers from a pulmonary embolism

11   which is an affliction where one develops blood clots in the

12   heart.  Often it's fatal.

13          Additionally, one of things that is key in having it

14   not be fatal is proper medical attention, specifically

15   preventing blood clots from appearing in the legs.  That's why

16   -- the reason why my client offered to the Pretrial Services

17   officer that he needs to have stents basically surgically

18   implanted in there and that's to increase the flow of clogged

19   blood vessels.

20          So he suffers from very serious medical conditions.

21   There are less restrictive conditions.  He didn't threaten the

22   deputies in any way or engage in any way that would make him a

23   danger to the community.

24          He does have some criminal history although it's

25   rather old.  I believe his last offense was in 2009 as

1    indicated in the background report and then his prior offense

2    was a juvenile conviction where he was charged as an adult.

3            Over the last few years, he has had some interaction

4    with law enforcement.  However, all of those charges have been

5    dismissed by the State government by way of nolle.

6            So he suffers from some serious life-threatening

7    conditions.  He needs constant medical attention.  I think

8    under the current environment and particularly during a

9    pandemic, it's difficult enough to get that kind of medical

10   attention.  However, when one is incarcerated, there is that

11   added obstacle.

12           And, finally, so there is the real possibility based

13   on the potential sentencing range I mentioned that he could end

14   up serving more time on this awaiting resolution of it than he

15   could be potentially facing.  We have a suitable plan in place

16   for him to stay with his grandmother.  She is more than willing

17   to do that.  She understands what's involved.

18           And I understand that in some circumstances maybe

19   La Pasada would be a better option but as my colleague had

20   proffered before earlier, La Pasada is not accepting anyone

21   right now is what we've been told on account of the COVID

22   outbreak.

23           So given that this is a rather minor charge and not

24   really what we normally see in court -- and not to excuse it

25   but I do believe there are less restrictive conditions in

24

1   place.

2          And there's one final piece of evidence I'd like to

3   proffer to the Court and, again, this does not justify my

4   client's actions but it does provide context for it.

5   Mr. Gross' family has a history with the Bernalillo County

6   Sheriff's office and also law enforcement in general that has

7   been a little bit problematic.

8          In fact, they successfully sued Bernalillo County

9   Sheriff and other County agencies in 2008 under The Torts

10  Claims Act for a pattern of misconduct in profiling and

11  violations that were not limited to but included things such as

12  improper use of administrative searches under the auspices of

13  the zoning violations, repeated traffic stops of his family

14  members and they did ultimately prevail in that suit under The

15  Torts Claims Act.

16         And, again, that does not excuse his actions but in

17  all candor to the Court, they do sort of default to the

18  perspective that law enforcement is out there not to help them

19  but to harass them.  Again, that doesn't excuse his actions but

20  it does sort of explain why this happened in this way.

21         I did speak to the grandmother and she felt the same

22  way.  She was very irritated by this whole event.  She said she

23  came home from the grocery store.  It's the middle of January

24  in a cold spell.  She is 80 years.  She was forced to stand out

25  on her porch for over an hour while the agents searched her

25

1   house under the auspices of searching for any other dangerous

2   individuals.  Not that that's necessarily relevant but as I

3   said, the whole family does sort of have that perspective.

4           So I would ask the Court to give him an opportunity

5   at liberty and staying with his grandmother in the meantime

6   before we resort to detaining him on this matter.  That way he

7   can continue his medical treatment, hopefully not die, frankly,

8   and give him an opportunity to defend these charges.  Thank

9   you, Your Honor.

10          **THE COURT:**  Before I turn to Mr. White, Mr. Glanz, I

11  heard testimony from Deputy Glisson that there were firearms

12  located within the trailer.  Obviously, that's somewhat of a

13  concern -- a great concern to the Court.  Also, perhaps it

14  should be a concern for Mr. Gross given the fact that I believe

15  he's got a felony conviction in his past.

16          Do you have any information about whether there are

17  firearms at the location?

18          **MR. GLANZ:**  I do not, Your Honor, and I would share

19  the Court's concern.  I did also note in the -- I don't recall

20  if it was the Complaint or if it was the additional Rule 26

21  materials I was given by the Government but I do believe the

22  matter was referred to the ATF.  I don't know if anything came

23  of that.

24          Obviously, he's not charged with that here today but

25  I would certainly reach out to his grandmother after this

1    hearing and let her know that there absolutely cannot be any

2    firearms in her residence if he's to reside there.

3              **THE COURT:**  And last question, you indicated that

4    it's your estimation that at this point, your client's facing a

5    potential range of two to eight months under the sentencing

6    guidelines.  Is that prior to acceptance of responsibility,

7    after acceptance?  How do you calculate that?

8              **MR. GLANZ:**  That's without acceptance of

9    responsibility, Your Honor.

10             **THE COURT:**  Okay.  All right.  Thank you.

11             Mr. White, what's the Government's position?

12             **MR. WHITE:**  Your Honor, we believe that the nature

13   and circumstances of this offense -- although it seems making a

14   false statement might on the surface not seem terrible, the

15   fact is that Mr. Gross made the statement about a fugitive who,

16   according to the Complaint, was, I believe, wanted for

17   aggravated burglary with a deadly weapon which is a very

18   serious crime.

19             And as Your Honor noted, firearms -- and as Deputy

20   Glisson testified, firearms were found in the travel trailer.

21   And the matter was referred to the ATF and that is currently,

22   because it's out in the open, under investigation, as Your

23   Honor would know, given that he has a felony background.  So

24   this could evolve into something more for that reason.  So the

25   nature and circumstances are very serious.

1          The weight of the evidence is very strong.

2   Ms. Watkins was found literally inside the travel trailer after

3   Mr. Gross lied about it.  And Mr. Gross' history and

4   characteristics are extremely concerning.  Contrary to what

5   Mr. Glanz says, the United States does not believe he just has

6   some criminal history.  He has a very serious, massive criminal

7   history.

8          He has convictions and arrests for larceny,

9   kidnapping, aggravated battery with a deadly weapon, assault

10  with intent to commit a violent felony, attempted armed robbery

11  with a deadly weapon, aggravated fleeing of a law enforcement

12  officer, receiving or transferring a stolen motor vehicle

13  multiple times, just very, very, serious violent crimes.

14         He's also an extreme flight risk.  At least -- or he

15  has multiple charges of aggravated fleeing of a law enforcement

16  officer, multiple instances of probation being revoked,

17  multiple instances of failing to appear in court and to

18  Pretrial Services.  So he has demonstrated a pattern of not

19  respecting the law or conditions placed upon him and the United

20  States does not see a reason to believe that he would suddenly

21  change that outlook or propensity at this point.

22         He is also a danger to any person and the community

23  given his multiple violent crimes and arrests in the past.  So

24  the United States strongly believes that detention is necessary

25  in this case.

1              **THE COURT:**   Thank you.

2              All right.  So the Court has reviewed the Pretrial

3    Services Report and will take notice of that.  The Court

4    presided over the preliminary hearing where I received

5    evidence.  The Court has heard argument of counsel.

6              Under 18, United States Code, Section 3142(g), the

7    Court must consider a number of factors to determine whether or

8    not conditions or a combination of conditions can be set to

9    manage any concerns the Court might have regarding risk of

10   flight and danger to the community if the Defendant were to be

11   released.

12             Mr. White has ticked off a few of those factors.  The

13   weight of the evidence certainly is a factor that the Court

14   must consider.  It appears fairly strong to the Court at this

15   juncture for sure.

16             The nature of the offense -- this is an unusual

17   offense that we see -- we don't see very often in Federal court

18   and it's a nonviolent offense.  It's certainly obstructive in

19   its nature and by that token, is a very serious offense.

20   Certainly obstructing State and/or Federal agents in effecting

21   process is a serious matter.  Not cooperating with law

22   enforcement can be a serious matter and I think this certainly

23   is more serious than the title of the offense might on its

24   surface suggest.

25             The nature and characteristics of the Defendant give

1    the Court some pause.  Obviously, there's significant criminal

2    history here.  And Mr. Glanz is correct.  The last conviction

3    was, I think, in 2009.  That case resulted in a number of

4    probation violations and continued jurisdiction over the

5    Defendant until around 2015, it looks like, early 2015.

6    Everything after that for the last five, six years has been

7    dismissed.

8            There's still a number of charges, a number of State

9    misdemeanor charges, felony charges but they were -- they've

10   all been dismissed.  So to Mr. Gross' good fortune, he has no

11   further convictions for the last five or six years despite the

12   fact that he's been certainly the subject of attention of law

13   enforcement on a number of occasions.

14           What is most or perhaps a very important factor that

15   the Court must consider -- when viewing the nature and

16   characteristics of Mr. Gross, certainly the health concerns of

17   Mr. Gross are concerning to the Court and no one wants to see

18   Mr. Gross suffer because of or due to incarceration.  I've not

19   heard anything, however, that the jail can't accommodate his

20   medical conditions.

21           There's an insinuation that perhaps that's the case

22   but I haven't seen any evidence one way or the other that the

23   jail is not able to administer the medication that Mr. Gross

24   needs for those -- for that serious health condition.

25           His -- going back to his criminal history for a

1    moment, I think I mentioned there's been a number of probation

2    violations over the course of his involvement with the judicial

3    system, failures to appear, absconding.  That is, again,

4    seriously concerning to the Court.

5            However, when I look at the entire picture, the Court

6    is obligated to fashion, if possible, release and conditions of

7    release that would -- that are the least restrictive

8    combination of conditions that the Court might consider.  And I

9    think in this case, I'm not willing to allow or to authorize

10   Mr. Gross' release back home.  I think the fact that firearms

11   were found in the trailer is just too much of a red flag for

12   the Court.

13           So, Mr. Glanz, that's just not an option at least in

14   this Court's mind.  However, I do believe that supervision --

15   strict supervision while at La Pasada could effectuate -- could

16   mitigate any of the Court's concerns regarding danger to the

17   community and flight risk.

18           I would -- I will authorize Mr. Gross' release to

19   La Pasada Halfway House.  There is a waiting list.  It could be

20   some time before you get there, Mr. Gross, but at the La Pasada

21   Halfway House, you would be under strict supervision by

22   Pretrial Services.

23           I'm going to go over conditions with you in a moment

24   here.  I'm going to ask the representative, Officer Pirkovic,

25   to help me fashion those conditions right now.  But one of

1    those conditions -- well, two of those conditions -- one will

2    be to remain within Bernalillo County.  You are not permitted

3    to leave Bernalillo County.

4          And then, secondly, you will be under global

5    positioning, a GPS monitoring on home detention at La Pasada.

6    That allows you to go for legal appointments, for medical

7    appointments, for counseling appointments, employment if you

8    have employment but otherwise, you have to be at La Pasada.

9          So, Ms. Pirkovic, let me ask you to help me fashion

10   conditions here.  We understand that there's a delay of getting

11   into La Pasada but assuming Mr. Gross eventually arrives over

12   at La Pasada, standard conditions -- any special conditions

13   that you can think of?

14         **U.S. PRETRIAL SERVICES OFFICER PIRKOVIC:**  Your Honor,

15   we would recommend substance abuse counseling -- that would be

16   beneficial for him -- random drug screening, no tampering or

17   obstructing any -- with the substance abuse testing, refraining

18   from the use of alcohol, no firearms or destructive devices or

19   other dangerous weapons.  We would also recommend to report any

20   contact with law enforcement.  Also, no contact with any

21   witnesses.  I don't think there were any victims in this case.

22   Not obtain a passport or other international travel documents

23   and, of course, report for supervision to Pretrial Services.

24         **THE COURT:**  All right.  Mr. White, any conditions

25   that you would recommend to the Court that might be added to

32

1  those that you just heard?

2       **MR. WHITE:**  Just a slight addition.  I know that

3  Probation just said that potentially no contact with witnesses.

4  We would just explicitly request that would include Destiny

5  Watkins which shouldn't be a problem if she's already

6  incarcerated but just to make that clear.

7       **THE COURT:**  I agree.  Okay.

8       Anything further, Mr. Glanz, as far as conditions go?

9       **MR. GLANZ:**  Just one small matter, Your Honor.  It's

10 my understanding that he is not currently receiving his

11 multiple medications he needs.  If I could just ask the Court

12 to inquire and ask the U.S. Marshal Service to inquire with

13 Cibola just to make sure he does receive those because the

14 consequences are very serious, as I said, if he doesn't.

15      **THE COURT:**  Let me do that at the very end of our

16 hearing this morning but -- all right.

17      So, Mr. Gross, you've heard the Court and you've

18 heard our officer from Probation and Pretrial Services recite a

19 number of conditions.  That's going to be written down on an

20 order.  You will sign and acknowledge that order.  I can tell

21 you very clearly now that if there's any violation of these

22 conditions, I would imagine you're going to be back in custody

23 right away and that's where you will remain pending the

24 resolution of your case.  Do you understand that, sir?

25      **THE DEFENDANT:**  I do.

33

1          **THE COURT:**  All right.  Before we conclude the

2   hearing, let me just inquire of the United States Marshal

3   Service.

4          Well, Mr. Glanz, let me, first of all, ask you to

5   have your client make a medical request.  Make sure that he

6   does that.  And then I might also recommend that you have your

7   client sign a HIPAA release form so you can access his medical

8   records while he's at the facility.

9          But I'll ask the United States Marshals to inquire

10   whether -- into how Cibola Detention Facility is handling his

11   medical conditions at this time.

12          **U.S. MARSHAL SERVICE DEPUTY MCKENNA:**  Yes, Your

13   Honor.  This is Doug McKenna (phonetic) with the Marshal's

14   office.  I have it noted and I'll send that up to the facility.

15          **THE COURT:**  Thank you, Deputy.  I appreciate that.

16          All right.  Is there anything further on behalf of

17   the United States?

18          **MR. WHITE:**  Nothing further, Your Honor.

19          **THE COURT:**  Anything further on behalf of Mr. Gross?

20          **MR. GLANZ:**  No, Your Honor.  May I be excused?

21          **THE COURT:**  Yes.  Thank you for your presence.

22          All right.  We'll be in recess.

23          **MR. WHITE:**  May I be excused as well, Your Honor?

24          **THE COURT:**  Yes, Mr. White.  Thank you.

25          **MR. WHITE:**  Thank you.  Have a good day.

(This proceeding adjourned at 10:43 a.m.)


### CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    December 7, 2021

                Signed                                          Dated



_TONI HUDSON, TRANSCRIBER_