# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                     No. CR 21-0297 JB

DEAN GROSS,

       Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) Defendant Dean Gross' Oral Motion to Dismiss Count Two of the Indictment ("Motion to Dismiss"), made at the December 21, 2021, Hearing, <u>see</u> Clerk's Minutes at 3-4, filed December 21, 2021 (Doc. 101)("Clerk's Minutes for December 21, 2021, Hearing")[1]; and (ii) Defendant's Memorandum in Support of Oral Motion to Dismiss Count Two of the Indictment, filed January 20, 2021 (Doc. 104)("Motion to Dismiss Memo."). The primary issues are whether the Court should dismiss Count Two of the Superseding Indictment, filed December 8, 2021 (Doc. 49), which charges Gross with escaping from La Pasada Halfway House in Albuquerque, New Mexico, in violation of 18 U.S.C. § 751, (i) because Gross was not "in custody" within 18 U.S.C. § 751's meaning; or (ii) because 18 U.S.C. § 751 is unconstitutional. First, the Court concludes that, in <u>United States v. Sack</u>, 379 F.3d 1177, 1178 (10th Cir. 2004), the United States Court of Appeals for the Tenth Circuit concludes that a person who is ordered to reside at a halfway house while in pre-trial custody is "in custody" as 18 U.S.C.

---

[1] The Court orally denied the Motion to Dismiss at Gross' Change of Plea hearing on December 22, 2022. <u>See</u> Clerk's Minutes at 1, filed December 22, 2021 (Doc. 103). The Court promised the parties an opinion on its ruling. This Memorandum Opinion and Order is the promised opinion.

§ 751 defines that phrase, and that the Tenth Circuit's decision in United States v. Sack binds the Court as a district court. Second, the Court concludes that 18 U.S.C. § 751 is not unconstitutional, because Congress has the authority to enact the law pursuant to its operation of federal prisons. Consequently, the Court will deny the Motion to Dismiss.

## **FACTUAL BACKGROUND**

The Court takes its facts from the Criminal Complaint, filed January 27, 2021 (Doc. 1)("Complaint"), and the Superseding Indictment. The Court recognizes that, because the Court draws facts from the Complaint and the Superseding Indictment, these facts largely reflect the United States' version of events. On January 23, 2021, United States Deputy Marshal Jimmie Glisson conducted an enforcement operation to locate and to apprehend "numerous persons" who "had violated the terms of their respective supervision, resulting in the issuance of a State of New Mexico Arrest Order/Warrant." Complaint ¶ 1, at 2. One subject, Destany Watkins, had an outstanding arrest warrant. See Complaint ¶ 2, at 3. After receiving information that Watkins was residing at an address in Albuquerque, Glisson, along with several other officers, went to the Albuquerque address. See Complaint ¶ 3, at 3. At the residence, Glisson noticed two locations where a person could be present: (i) a main structure; and (ii) a travel trailer adjacent to the main structure. See Complaint ¶¶ 3-4, at 3. When the officers arrived at the residence, Gross was in the trailer. See Complaint ¶ 5, at 3. Glisson observed Officer Aubyn Rhoades inform Gross that the officers were looking for Watkins. See Complaint ¶ 5, at 3. Gross stated that he did not know Watkins. See Complaint ¶ 5, at 3. During Gross' and Rhoades' conversation, Gross "stated that there was no one else inside the travel trailer." Complaint ¶ 5, at 4. Glisson observed, however, another person in the trailer. See Complaint ¶ 6, at 4. Officers again asked Gross who else was in the trailer, and Gross continued to deny that there was anyone else in the trailer. See Complaint

¶ 6, at 4.  Eventually, Gross exited the trailer, but officers continued to observe the trailer.  See Complaint ¶ 8, at 4.  Glisson informed Gross that he had a warrant for Watkins' arrest and told Gross that, "under Federal Law, anyone lying to a federal officer could be charged with a federal crime."  Complaint ¶ 9, at 4.  Gross continued to deny knowing Watkins.  See Complaint ¶ 10, at 4.  While officers escorted Gross to the main residence, Rhoades began communicating with someone in the travel trailer.  See Complaint ¶¶ 10-11, at 4-5.  Shortly thereafter, Watkins exited the travel trailer, and the officers took her into custody.  See Complaint ¶ 11, at 5.

## PROCEDURAL BACKGROUND

On January 27, 2021, Plaintiff United States of America filed the Complaint against Gross, alleging that Gross violated 18 U.S.C. § 1001 by "knowingly and willfully mak[ing] a false statement to an officer or employee acting under the authority of the United States."  Complaint at 1.  Officers arrested Gross on February 22, 2021.  See Arrest Warrant Returned Executed, filed February 22, 2021 (Doc. 4).  On February 25, 2021, the Honorable John F. Robbenhaar, United States Magistrate Judge in the United States District Court for the District of New Mexico, entered an Order setting Gross' release conditions.  See Order Setting Conditions of Release, filed February 25, 2021 (Doc. 15)("Release Conditions").  The Release Conditions state:

> The defendant is placed in the custody of: La Pasada Halfway House . . . who agrees to (a) supervise the defendant, (b) use every effort to assure the defendant's appearance at all court proceedings, and (c) notify the court immediately if the defendant violates a condition of release or is no longer in the custodian's custody.

Release Conditions ¶ 6, at 2.  The Release Conditions further state: "The defendant is ORDERED released after processing."  Release Conditions at 3.

On April 21, 2021, La Pasada notified Pretrial Services that Gross left La Pasada without permission and did not return.  See 2nd Amended Petition for Action on Conditions of Pretrial

Release, filed August 20, 2021 (Doc. 28)("Amended Petition").  On April 21, 2021, "Pretrial contacted the defendant and instructed him to turn himself in to law enforcement."  Amended Petition at 2.  Federal officers again arrested Gross on August 30, 2021.  See Arrest of Dean Gross, filed August 30, 2021 (text only entry).  On December 8, 2021, a federal Grand Jury charged Gross with: (i) Count 1, making a false statement to a federal officer by lying about Watkins' presence in his trailer, in violation of 18 U.S.C. § 1001(a)(2); and (ii) Count 2, knowingly escaping from La Pasada, an institution in which he was in custody pursuant to Magistrate Judge Robbenhaar's Order, in violation of 18 U.S.C. § 751(a).  See Superseding Indictment at 1-2.

On December 21, 2021, on his trial's eve, Gross signed a plea agreement in which he pled guilty to Count 2 of the Superseding Indictment, for escaping from the custody of La Pasada in violation of 18 U.S.C. § 751.  See Plea Agreement, filed December 21, 2021 (Doc. 92)("First Plea Agreement").  In Gross' First Plea Agreement, he reserved the right to appeal the following on any grounds argued by the Defendant in district court:

> a.  Whether the United States Court of Appeals for the Tenth Circuit should overturn its decision in *United States v. Sack*, 739 F.3d 1177 (10th Cir. 2004).  In particular, the Defendant anticipates filing a motion to dismiss the indictment based on his belief that *Sack* was incorrectly decided, and the defendant reserves his right to appeal the district court's decision on his motion to dismiss the indictment.

First Plea Agreement ¶ 19, at 7.  The Honorable Laura Fashing, United States Magistrate Judge in the United States District Court for the District of New Mexico, took Gross' guilty plea.  See Clerk's Minutes at 1, filed December 21, 2021 (Doc. 93).  After Magistrate Judge Fashing took Gross' guilty plea, but before the Court accepted the plea agreement, the Court held a hearing and expressed its concern that the terms of the agreement were unenforceable, and notified the parties that it was inclined to reject plea agreement, because Gross has not filed yet the motion to dismiss

- 4 -

that he preserved the right to appeal.  See Clerk's Minutes for December 21, 2021, Hearing at 3-4.  Gross orally requested to withdraw from his plea agreement, and the Court orally granted that request.  See Clerk's Minutes for December 21, 2021, Hearing at 4.  Gross then orally moved to dismiss Count 2 of the Superseding Indictment.  See Clerk's Minutes for December 21, 2021, Hearing at 4.  Subsequently, the United States and Gross filed a Joint Motion to Withdraw the Plea Agreement, filed December 21, 2021 (Doc. 94)("Motion to Withdraw Plea").  In the Motion to Withdraw Plea, the parties ask the Court to allow Gross to withdraw his First Plea Agreement, so that the parties could preserve Gross' right to appeal the Motion to Dismiss.  See Motion to Withdraw Plea at 1-2.  The Court granted the Motion to Withdraw Plea.  See Order Granting Joint Motion to Withdraw the Plea, filed December 22, 2021 (Doc. 95).   At the December 22, 2021, hearing, the Court orally denied Gross' Motion to Dismiss.  See Clerk's Minutes at 1, filed December 22, 2021 (Doc. 103).  The Court provides its analysis on the Motion to Dismiss herein.

On January 20, 2022, Gross filed his Motion to Dismiss Memo.  See Motion to Dismiss Memo. at 1.  In his Motion to Dismiss Memo., Gross contends that the Tenth Circuit case, United States v. Sack, 379 F.3d 1177, "is wrongly decided, [that] the Court lacked jurisdiction over the offense, and that it is fundamentally unfair that a defendant can be charged with escape for leaving a halfway house where he does not get presentence confinement credit."  Motion to Dismiss Memo. at 1-2.  In support of his argument that United States v. Sack is wrongly decided, Gross notes that there is a split among the United States Courts of Appeals regarding 18 U.S.C. § 751.  See Motion to Dismiss Memo. at 3.   First, Gross argues that, in United States v. Baxley, 982 F.2d 1265 (9th Cir. 1992), the United States Court of Appeals for the Ninth Circuit holds that a person residing at a halfway house on conditions of release pre-conviction cannot be charged with escape for leaving the halfway house.  See Motion to Dismiss Memo. at 3 (citing United States v. Baxley,

982 F.3d at 1269-70).  Next, Gross argues that the Tenth Circuit was the second Court of Appeals to consider the issue and that, in United States v. Sack, the Tenth Circuit reached the opposite conclusion as the Ninth Circuit did in United States v. Baxley.  See Motion to Dismiss Memo. at 3.  Gross notes that, in United States v. Sack, the Tenth Circuit concludes that 18 U.S.C. § 751 does not require that a defendant be in the Attorney General's custody to be charged with escape. See Motion to Dismiss Memo. at 3 (citing United States v. Sack, 379 F.3d at 1179-82).  Gross also notes that, in United States v. Sack, the Tenth Circuit "interpreted *Baxley* as being limited to the specific conditions imposed on that defendant," Motion to Dismiss Memo. at 4, and asserts that, in United States v. Burke, 694 F.3d 1062 (9th Cir. 2012), the Ninth Circuit "described *Baxley* as holding 'that a defendant released on a personal recognizance bond and ordered by a court to reside at a halfway house pending trial is not in 'custody' for'" 18 U.S.C. § 751's purposes, Motion to Dismiss Memo. at 4 (quoting United States v. Burke, 694 F.3d at 1064).  Gross states that he has found "no other federal appellate court that has addressed the question presented in *Baxley* and *Sack*."  Motion to Dismiss Memo. at 4.

Second, Gross argues that United States v. Sack is wrongly decided.  See Motion to Dismiss Memo. at 4.  Gross contends that the Tenth Circuit's holding "misinterprets the phrase 'by virtue of any process issued under the laws of the United States.'"  Motion to Dismiss Memo. at 4 (quoting 18 U.S.C. § 751).  Gross argues that the question presented in United States v. Sack is whether a person not in the Attorney General's custody nonetheless can be in custody for the escape statute's purposes.  See Motion to Dismiss Memo. at 4-5.  Gross contends that the Tenth Circuit relies on three opinions -- United States v. Swanson, 253 F.3d 1220 (10th Cir. 2001), United States v. Depew, 977 F.2d 1412 (10th Cir. 1992), and Credille v. United States, 354 F.2d 652 (10th Cir. 1965) -- which explain, in different contexts, what constitutes custody.  Gross argues

that "while these opinions do support the holding that a person can escape without being in the custody of the Attorney General they do not show that a defendant *released* to a halfway house is in custody."  Motion to Dismiss Memo. at 5 (emphasis in original).  Moreover, Gross argues that the Tenth Circuit's opinion "misinterprets the essential language in the custody statute" and, therefore, "drastically expands the conduct criminalized by the statute in a way not supported by prior precedent."  Motion to Dismiss Memo. at 5.  Gross also argues that the Tenth Circuit "misapplies the doctrine of statutory construction by rejecting the plain meaning of the statute and never considering legislative intent."  Motion to Dismiss Memo. at 6.  Gross argues that the title of 18 U.S.C. § 751 -- "'Prisoners in custody of institution or officer'" -- indicates that, to be charged with escape, a person must be a prisoner in custody, Motion to Dismiss Memo. at 7 (quoting 18 U.S.C. § 751), and that custody's plain meaning requires a person to be in physical custody, see Motion to Dismiss Memo. at 7 (citing Physical Custody, Black's Law Dictionary (11th ed. 2019)("Custody of a person (such as an arrestee) whose freedom is directly controlled and limited.")).  Moreover, Gross argues that the legislative intent of § 751 "makes it clear that the statute is intended to criminalize conduct of '[p]risoners in custody of institution or officer.'" Motion to Dismiss Memo. at 7 (quoting 18 U.S.C. § 751).  Gross also notes that it is fundamentally unfair to hold that an individual who cannot receive credit towards a future sentence for pre-conviction time spent at a halfway house can be convicted of escaping the halfway house.  See Motion to Dismiss Memo. at 7.

Finally, Gross argues that the United States v. Sack opinion is "a judicial expansion of jurisdiction that violates the Commerce Clause," U.S. Const. art. I, § 8.  Motion to Dismiss Memo. at 8.  Gross notes that, in United States v. Lopez, 514 U.S. 549 (1995), the Supreme Court of the United States of America concludes that a federal statute must "substantially affect interstate

commerce in order to be a valid exercise of congressional authority."  Motion to Dismiss Memo. at 8-9.  Gross argues that the same logic applies to 18 U.S.C. § 751: neither United States v. Sack, the statute, nor the pattern jury instruction on 18 U.S.C. § 751 "make any mention of the necessity that the conduct in some way affect interstate commerce."  Motion to Dismiss Memo. at 9.  Further, Gross notes that "La Pasada is a non-profit entity that has a contract with Probation and Parole for the District of New Mexico to house some individuals on pretrial release.  A statute that criminalizes a person leaving a halfway house without permission has absolutely no effect on interstate commerce."  Motion to Dismiss Memo. at 9.  Gross argues, therefore, that 18 U.S.C. § 751 is unconstitutional as applied.  See Motion to Dismiss Memo. at 9.

The United States responds.  See United States' Response in Opposition to Defendant's Memorandum in Support of Oral Motion to Dismiss Count Two of the Indictment, filed February 3, 2022 (Doc. 105)("Response").  The United States argues that the Court must deny Gross' Motion to Dismiss, because United States v. Sack is binding precedent that squarely holds that a person can be convicted of escape after absconding from La Pasada.  See Response at 3.  Next, the United States argues that, even if United States v. Sack is not binding precedent, it is not decided wrongly.  See Response at 4.  First, the United States argues that United States v. Sack is not decided wrongly, because the Tenth Circuit interprets correctly 18 U.S.C. § 751's plain language. See Response at 4-5.  Specifically, the United States argues that 18 U.S.C. § 751's language

> lists multiple ways that a person can be guilty of the crime of escape . . . : if a person is (1) arrested on a charge of felony and then (2) placed in *any* custody (3) by virtue of *any* process issued under the laws of the United States (4) by *any* court, judge, or magistrate judge, and then (5) escapes from that custody, then he has violated § 751(a).

Response at 5 (emphasis in original).  The United States acknowledges that "the word 'custody' in § 751 does much of the work," Response at 5 (quoting 18 U.S.C. § 751), but argues that Gross

was "an arrestee whose freedom was directly controlled and limited, because he was not permitted to leave La Pasada without permission and was subject to express rules while living at La Pasada," Response at 5-6 (citing Physical Custody, Black's Law Dictionary (11th ed. 2019). Moreover, the United States argues that § 751's use of the terms "'custody or confinement'" implies that the statute differentiates between and penalizes both formal confinement, like imprisonment in a jail or prison, and less formal custody, such as a halfway house. See Response at 6-7 (quoting 18 U.S.C. § 751). The United States also refutes Gross' argument that the reference in § 751's title to a prisoner in custody is not dispositive, because the title to a statutory provision is not part of the law itself, and it is not controlling regarding its construction. See Response at 7 (citing United States v. Rakes, 510 F.3d 1280, 1289 (10th Cir. 2007)).

Second, the United States argues that the Tenth Circuit correctly interpreted prior Tenth Circuit precedent in United States v. Sack. See Response at 9. The United States argues: "The opinions on which the *Sack* panel relied all reflect the plain language of § 751(a) and were thus properly utilized by the panel." Response at 9. Moreover, the United States argues that United States v. Swanson, 253 F.3d 1220, United States v. Depew, 977 F.3d 1412, and Credille v. United States, 354 F.2d 652, all suggest that a pretrial resident of a halfway house is in custody. See Response at 9. The United States also asserts that United States v. Baxley and United States v. Burke are distinguishable from United States v. Sack, because "they fail to track the plain meaning of "'custody.'" Response at 10 (no citation for quotation).

Third, the United States argues that United States v. Sack's holding is not fundamentally unfair. See Response at 12. The United States contends that Gross waived the argument that United States v. Sack's holding is fundamentally unfair, because he does not elaborate why the holding is unfair; he provides merely a conclusive statement that it is unfair. See Response at 13.

The United States contends that, even if Gross has not waived the argument, United States v. Sack is not fundamentally unfair, because the Supreme Court has concluded soundly that time spent in a halfway house does not count for pre-confinement credit, because a halfway house is not equivalent to imprisonment administered by the Bureau of Prisons or the Attorney General.  See Response at 13 (citing Reno v. Koray, 515 U.S. 50, 65 (1995)).

Finally, the United States contends that 18 U.S.C. § 751's application to Gross does not violate the Commerce Clause.  See Response at 13.  The United States argues that the Commerce Clause alone did not give Congress the power to enact 18 U.S.C. § 751, see Response at 14, and that "§ 751(a) is most accurately characterized as a federal crime that arises from Congress's derived power (via the Necessary and Proper Clause) to enact laws dealing with the federal criminal justice system itself -- that is, it's a law that prevents people in custody from escaping from that system."  Response at 15 (citing United States v. Comstock, 560 U.S. 126, 136 (2010)).  Consequently, the United States argues, the Commerce Clause is not how § 751(a) receives its federal "'jurisdictional hook.'"  Response at 15 (quoting Sabri v. United States, 541 U.S. 600, 605 (2004)).

**LAW REGARDING THE COMMERCE CLAUSE**

The Commerce Clause permits Congress to regulate three categories: "First, Congress can regulate the channels of interstate commerce.  Second, Congress has authority to regulate and protect the instrumentalities of interstate commerce, and persons or things in interstate commerce. Third, Congress has the power to regulate activities that substantially affect interstate commerce." Gonzales v. Raich, 545 U.S. 1, 16-17 (2005)("Raich")(citations omitted).[2]  Notwithstanding that

---

[2]Over a decade ago, Justice Scalia wrote a scathing critique of this formulation:

pronouncement and others like it, common sense dictates that Congress' power under the Commerce Clause cannot extend to every activity that affects interstate commerce.   As an illustration, many economists contend that the Second World War ended the Great Depression,[3]

---

Since Perez v. United States, 402 U.S. 146 (1971), our cases have mechanically recited that the Commerce Clause permits congressional regulation of three categories: (1) the channels of interstate commerce; (2) the instrumentalities of interstate commerce, and persons or things in interstate commerce; and (3) activities that "substantially affect" interstate commerce.   Id. at 150.   The first two categories are self-evident, since they are the ingredients of interstate commerce itself.   The third category, however, is different in kind, and its recitation without explanation is misleading and incomplete.

It is *misleading* because, unlike the channels, instrumentalities, and agents of interstate commerce, activities that substantially affect interstate commerce are not themselves part of interstate commerce, and thus the power to regulate them cannot come from the Commerce Clause alone.   Rather, as this Court has acknowledged since at least United States v. Coombs, 37 U.S. (12 Pet.) 72 (1838), Congress's regulatory authority over intrastate activities that are not themselves part of interstate commerce (including activities that have a substantial effect on interstate commerce) derives from the Necessary and Proper Clause.   And the category of "activities that substantially affect interstate commerce," is *incomplete* because the authority to enact laws necessary and proper for the regulation of interstate commerce is not limited to laws governing intrastate activities that substantially affect interstate commerce.   Where necessary to make a regulation of interstate commerce effective, Congress may regulate even those intrastate activities that do not themselves substantially affect interstate commerce.

Raich, 545 U.S. at 33-35 (Scalia, J., concurring in judgment)(footnote and citations omitted)(emphasis in the original).

[3]"What ended the Great Depression?   In the traditional view, the answer is World War II, a conclusion that appears in the works of numerous economists and historians."   J.R. Vernon, World War II Fiscal Policies and the End of the Great Depression, 54 J. Econ. Hist. 850, 850 (1994).   That traditional view is not universally accepted, however:

The conventional wisdom is that the U.S. economy remained depressed for all of the 1930s and only returned to full employment following the outbreak of World War II[, but] declines in real output in the early 1930s, and again in 1938, were so large that it took many years of unprecedented growth to undo them and return real output to normal levels.

 . . . .   Between 1929 and 1933, real GNP declined 35 percent; between 1933 and

but suggesting that the Commerce Clause permits Congress to stimulate the national economy by sending millions of Americans soldiers overseas would be inaccurate.

A more recent Supreme Court Commerce Clause decision, National Federation of Independent Business v. Sebelius, 567 U.S. 519 (2012)("Sebelius"), confirms that common-sense insight.  Five Supreme Court Justices concluded that the individual mandate in the Affordable Care Act, Pub. L. No. 111-148, 123 Stat. 119 (2010) -- which requires individuals to obtain health insurance or else to pay a penalty to the Internal Revenue Service -- cannot be justified on Commerce Clause grounds, even though the individual mandate has immense effects on interstate commerce.  See Sebelius, 567 U.S. at 558, 561 (opinion of Roberts, C.J.); id. at 649-57 (joint opinion of Scalia, Kennedy, Thomas, and Alito, JJ.).  Sebelius thus reveals that a valid exercise of Congress' Commerce Clause power requires more than a substantial effect on interstate commerce. See Sebelius, 567 U.S. at 558, 561 (opinion of Roberts, C.J.); id. at 649-57 (joint opinion of Scalia, Kennedy, Thomas, and Alito, JJ.).

The Court's survey of Supreme Court precedent indicates, instead, that three requirements apply when Congress seeks to exercise its power "to regulate commerce . . . among the several states."  U.S. Const. art. I, § 8, cl. 3.  Congress must: (i) regulate; (ii) commerce;[4] (iii) that

---

1937, it rose 33 percent. In 1938 the economy suffered another 5 percent decrease in real GNP, but this was followed by an even more spectacular increase of 49 percent between 1938 and 1942.  By almost any standard, the growth of real GNP in the four-year periods before and after 1938 was spectacular.

Christina D. Romer, What Ended the Great Depression?, 52 J. Econ. Hist. 757, 759-60 (1992); id. at 758 ("'[I]t is hard to attribute any of the pre-1942 catch-up of the economy to the war.'" (quoting J. Bradford de Long, Lawrence H. Summers et al., How Does Macroeconomic Policy Affect Output?, 1988 Brookings Papers on Economic Activity 433, 467).

[4]"[T]hus far in our nation's history, our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature."  United States v. Morrison, 529

possesses significant interstate effects.  The Court addresses each requirement in turn.

First, according to Chief Justice John Marshall, the "power to regulate" an activity is the power "to prescribe the rule by which" the activity "is to be governed."  Gibbons v. Ogden, 22 U.S. (9 Wheat) 1, 196 (1824)(Marshall, C.J.).  Under that broad definition, many laws qualify as regulations, including laws: (i) prohibiting shipment of goods made under certain labor conditions, see United States v. Darby, 312 U.S. 100, 113 (1941); (ii) imposing production limitations, see Wickard v. Filburn, 317 U.S. 111 (1942); (iii) affirmatively authorizing navigation and trade, see Gibbons v. Ogden, 22 U.S. (9 Wheat) at 212-13; (iv) proscribing racial discrimination in particular industries, see Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 258, 261 (1964)(hotels); Katzenbach v. McClung, 379 U.S. 294, 304-05 (1964)(restaurants); and (v) prohibiting extortionate lending practices, Perez v. United States, 402 U.S. 146, 156-57 (1971).  The only restriction that the Supreme Court has articulated regarding congressional actions that qualify as regulations is that regulating an activity does not encompass requiring people to engage in that activity.  See Sebelius, 567 U.S. at 550 (opinion of Roberts, C.J.)("The power to *regulate* commerce presupposes the existence of commercial activity to be regulated." (emphasis in original)); id. at 649 (joint opinion of Scalia, Kennedy, Thomas, and Alito, JJ.)("[O]ne does not regulate commerce that does not exist by compelling its existence.").  While the Supreme Court's capacious understanding of regulation means that almost any congressional action qualifies, Congress must still satisfy the Commerce Clause's less-than-demanding regulation requirement.

---

U.S. at 613.  Congress can reach noneconomic activity that affects interstate commerce, if at all, by supplementing its power to regulate interstate commerce with its Necessary and Proper Clause power "[t]o make all laws which shall be necessary and proper for carrying" other powers "into execution."  U.S. Const. art. I, § 8, cl. 18.  See infra (describing the scope of Congress' power under the Necessary and Proper Clause).

See Sebelius, 567 U.S. at 550 (opinion of Roberts, C.J.)("The Framers gave Congress the power to *regulate* commerce, not to *compel* it . . . .")(emphasis in original); id. at 690 (joint opinion of Scalia, Kennedy, Thomas, Alito, JJ.)(denying that "failure to enter the health insurance market . . . is an *activity* that Congress can 'regulate'")(emphasis in original).

Second, again according to Chief Justice Marshall, "commerce" refers to more than just "traffic, to buying and selling, or the interchange of commodities." Gibbons v. Ogden, 22 U.S. at 189-90. Commerce, instead, means "intercourse[,] . . . the commercial intercourse between nations, and parts of nations, in all its branches," so commerce comprehends both "navigation" and "the admission of vessels of one nation into the ports of the other." Gibbons v. Ogden, 22 U.S. at 189-90. More recently, the Supreme Court defined "'[e]conomics'" as "'the production, distribution, and consumption of commodities.'" Raich, 545 U.S. at 25 (quoting Webster's Third New International Dictionary 720 (1966)). Importantly, the Supreme Court has discarded the antiquated notion that production is not commerce. Compare Raich, 545 U.S. at 26 (concluding that the Controlled Substances Act is a permissible exercise of Congress' Commerce Clause power, because it "regulates quintessentially economic activities: the production, distribution, and consumption of commodities for which there is an established, and lucrative, interstate market"), with Hammer v. Dagenhart, 247 U.S. 251, 272 (1918)("The making of goods and the mining of coal are not commerce, nor does the fact that these things are to be afterwards shipped, or used in interstate commerce, make their production a part thereof."). Commerce thus includes, among other things: (i) coal mining; (ii) lending money; (iii) restaurant operation; (iv) providing hospitality; and (v) growing wheat for personal use. See United States v. Lopez, 514 U.S. at 559-60 (citing Hodel v. Va. Surface Mining & Reclamation Ass'n, 542 U.S. 264 (1981); Perez v. United States, 402 U.S. 146 (1971); Katzenbach v. McClung, 379 U.S. 294 (1964); Heart of

Atlanta Motel, Inc. v. United States, 379 U.S. 241 (1964); and Wickard v. Filburn, 317 U.S. 111 (1942)).

Recent years have supplemented that litany with counterexamples, i.e., activities that are not commerce: (i) "mere gun possession," United States v. Lopez, 514 U.S. at 585 (Thomas, J., concurring); see id. at 562 (Rehnquist, C.J.)(faulting a federal statute for lacking an "express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with" commerce); (ii) "[g]ender-motivated crimes of violence," United States v. Morrison, 529 U.S. at 613 (Rehnquist, C.J.)(declaring that such crimes "are not, in any sense of the phrase, economic activity"); (iii) simple possession -- as opposed to possession with intent to distribute -- of drugs, see Raich, 545 U.S. at 40 (Scalia, J., concurring in judgment); and (iv) "the failure to enter the health insurance market," Sebelius, 567 U.S. at 660 (joint opinion of Scalia, Kennedy, Thomas, and Alito, JJ.); see id. at 550-51 (opinion of Roberts, C.J.).  While commerce -- like regulation -- takes a myriad of forms, the Supreme Court has been clear that Congress must satisfy the commerce requirement to validly exercise its power under the Commerce Clause.  See Sebelius, 567 U.S. at 557 (opinion of Roberts, C.J.)("We have said that Congress can anticipate the *effects* on commerce of an economic activity.  But we have never permitted Congress to anticipate that activity itself in order to regulate individuals not currently engaged in commerce.")(emphasis in original)(citations omitted); id. ("The Commerce Clause is not a general license to regulate an individual from cradle to grave, simply because he will predictably engage in particular transactions."); id. at 648 (joint opinion of Scalia, Kennedy, Thomas, Alito)("[T]o say the *failure* to grow wheat (which is *not* an economic activity, or any activity at all) nonetheless affects commerce and therefore can be federally regulated, is to make mere breathing in and out the basis for federal prescription and to extend federal power to virtually

all human activity."  (emphasis in original)).  See also United States v. Morrison, 529 U.S. at 617 ("We accordingly reject the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce."); United States v. Lopez, 514 U.S. at 560 (Rehnquist, C.J.)("Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained.").

Third, yet again according to Chief Justice Marshall, Congress cannot use the Commerce Clause to authorize commercial regulation regarding "the exclusively internal commerce of a State."  Gibbons v. Ogden, 22 U.S. (9 Wheat) at 195.  "The completely internal commerce of a State" encompasses only commerce that is "carried on between man and man in a State, or between different parts of the same State, and which does not extend to or affect other States."  Gibbons v. Ogden, 22 U.S. (9 Wheat) at 194-95.  In our modern, interconnected world, it is difficult to imagine activity that both qualifies as commerce and that does not affect "more States than one."  Gibbons v. Ogden, 22 U.S. (9 Wheat) at 194.  Further, whether commerce produces interstate effects is a factual issue -- and not a legal issue -- and the Supreme Court is willing to defer to Congress' judgment on that issue as long as that judgment is rational.  See Raich, 545 U.S. at 22 ("We need not determine whether respondents' activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding."); Hodel v. Va. Surface Mining & Reclamation Ass'n, 452 U.S. at 276 ("The court must defer to a congressional finding that a regulated activity affects interstate commerce, if there is any rational basis for such a finding.").

Notwithstanding those three limits, Congress can enact sweeping legislation regulating interstate commerce that also applies to some noncommercial and intrastate activity as long as the legislation's overbreadth is "necessary and proper for carrying into execution" Congress'

Commerce Clause power.  U.S. Const. art. I, § 8, cl. 18.  See McCulloch v. Maryland, 17 U.S. (4 Wheat) at 421 ("Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.").  For example, in the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197, Congress decided to regulate the interstate firearms market by excluding felons from it.  See 92 Stat. at 231, § 922(f) (prohibiting any person "who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year . . . to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce"); id. at 236, § 1202(a) (declaring that a felon "who receives, possesses or transports in commerce or affecting commerce . . . any firearm" commits a criminal offense).  The Commerce Clause -- taken alone -- permits Congress to regulate the interstate firearms market, but it does not permit Congress to regulate simple firearm possession near a school, because possession is not commerce.  See Lopez v. United States, (holding that legislation regulating firearm possession in school zones exceeded Congress' Commerce Clause power); id. at 551 (commenting that "[t]he Act" does not "regulate[] a commercial activity").  See also United States v. Morrison, 529 U.S. at 610 ("[A] fair reading of Lopez shows that the noneconomic, criminal nature of the conduct at issue was central to our decision in that case."); United States v. Dorris, 236 F.3d 582, 585 (10th Cir. 2000)("In Lopez, the Supreme Court struck down the 'Gun-Free School Zone Act,' 18 U.S.C. § 922(q)(1)(a), holding it exceeded Congressional power under the Commerce Clause because the Act did not regulate a commercial activity (possession of a gun near a school) . . . .").

Nevertheless, Congress acted constitutionally when it made it a crime for a felon to possess a firearm "in or affecting commerce," 18 U.S.C. § 922(g), because doing so was "necessary and

proper for carrying into execution" congressional regulation excluding felons from the interstate firearm market, U.S. Const. art. I, § 8, cl. 18. "Prohibiting the intrastate possession . . . of an article of commerce is a rational (and commonly utilized) means of regulating commerce in that product." Raich, 545 U.S. at 26. Prohibiting felons from receiving or transporting firearms in or affecting commerce without criminalizing possession would "significantly impede enforcement efforts." Scarborough v. United States, 431 U.S. 563, 576 (1977)(Marshall, J.). Forbidding felons to acquire firearms without forbidding them to possess firearms would be well-nigh unenforceable, because "[t]hose who do acquire guns after their conviction obviously do so surreptitiously and . . . it is very difficult as a practical matter to prove that such possession began after the possessor's felony conviction." Scarborough v. United States, 431 U.S. at 576. That sort of enforcement difficulty explains why "[p]rohibiting the intrastate possession . . . of an article of commerce is a rational (and commonly utilized) means of regulating commerce in that product." Raich, 545 U.S. at 26. Similarly, forbidding people to buy or otherwise acquire marijuana but permitting marijuana possession "would leave a gaping hole in the CSA [Controlled Substances Act, Pub. L No. 91-513, 84 Stat. 1236 (1971)]," so "Congress was acting well within its authority to 'make all laws which shall be necessary and proper' to 'regulate Commerce . . . among the several states'" when it prohibited marijuana possession. Raich, 545 U.S. at 22 (quoting U.S. Const. art. I, § 8)(second alteration in the original). See id. (commenting that "the enforcement difficulties that attend distinguishing between marijuana cultivated locally and marijuana grown elsewhere" justify Congress' decision "to regulate the intrastate manufacture and possession of marijuana . . . when it enacted comprehensive legislation to regulate the interstate market" in marijuana").

> That simple possession is a noneconomic activity is immaterial to whether it can be prohibited as a necessary part of a larger regulation. Rather, Congress's authority to enact all of these prohibitions of intrastate controlled-substance activities

> depends only upon whether they are appropriate means of achieving the legitimate
> end of eradicating Schedule I substances from interstate commerce.

Raich, 545 U.S. at 40 (Scalia, J., concurring in judgment).  On the other hand, Congress, could not

have prohibited felons from possessing firearms or people from possessing marijuana if it enacted

those prohibitions in isolation, i.e., without tying the prohibition to a regulation of commerce that

affects more states than one, because the Necessary and Proper Clause presupposes an exercise of

another congressional power.   See, e.g., United States v. Kebodeaux, 570 U.S. 387, 394-95

(observing that, while the Constitution "makes few explicit references to federal criminal law," the

Necessary and Proper Clause "authorizes congress in the implementation of other explicit powers,

to create federal crimes").

Determining whether Commerce Clause legislation is a regulation of commerce that affects

more states than one -- as opposed to a law that is necessary and proper for carrying such a

regulation into execution -- is more than an academic inquiry.  When Congress exercises its naked

Commerce Clause power, Congress can do whatever it likes as long as it does not violate express

constitutional prohibitions.  See Gibbons v. Ogden, 22 U.S. (9 Wheat) at 196 (declaring that the

Commerce Clause power, "like all others vested in Congress, is complete in itself, may be

exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the

constitution").  Thus, it is constitutionally proper for Congress to exercise its Commerce Clause

power with some ultimate purpose in view that Congress could not pursue directly even if it steps

on the toes of the States' traditional police power while doing so.

> The thesis of the opinion [in Hammer v. Dagenhart] that the motive of the
> prohibition or its effect to control in some measure the use or production within the
> states of the article thus excluded from the commerce can operate to deprive the
> regulation of its constitutional authority has long since ceased to have force.

United States v. Darby, 312 U.S. at 116.   Cf. Hammer v. Dagenhart, 247 U.S. at 271-72

(invalidating a statute denying "the facilities of interstate commerce to those manufacturers in the states who employ children within the prohibited ages," because the statute "in its effect does not regulate transportation among the states, but aims to standardize the ages at which children may be employed in mining and manufacturing within the states").

When Congress clothes the Commerce Clause with Necessary and Proper Clause vestments, on the other hand, resulting legislation is subject to two additional limitations: the legislation must be both necessary and proper.  Necessity does not mean "an absolute physical necessity, so strong, that one thing to which another may be termed necessary, cannot exist without that other."  McCulloch v. Maryland, 17 U.S. at 203.  Instead, necessity "frequently imports no more than that one thing is convenient, or useful, or essential to another."  McCulloch v. Maryland, 17 U.S. at 203.  In more recent years, the Supreme Court has translated McCulloch v. Maryland's necessity analysis into modern vocabulary such that "a particular federal statue" is constitutionally necessary if it "constitutes a means that is rationally related to the implementation of a constitutionally enumerated power."  United States v. Comstock, 560 U.S. at 134 (2010).  See Sabri v. United States, 541 U.S. 600, 605 (2004)(referring to this necessity relationship as "means-ends rationality").[5]

_____

[5]When the Supreme Court speaks precisely, it cleaves close to the Necessary and Proper Clause's text, and requires legislation to be necessary "for carrying into execution" Congress' enumerated powers, U.S. Const. art. I, § 8, cl. 18, as opposed to being necessary for achieving the public policy goals that Congress pursues by exercising its enumerated powers, see Sebelius, 567 U.S. at 560 (opinion of Roberts, C.J.)("Each of our prior cases upholding laws under [the Necessary and Proper] Clause involved exercises of authority derivative of, and in service to, a granted power."); id. at 653 (joint opinion of Scalia, Kennedy, Thomas, and Alito, JJ.)("The lesson of these cases is that the Commerce Clause, even when supplemented by the Necessary and Proper Clause, is not carte blanche for doing whatever will help achieve the ends Congress seeks by the regulation of commerce.").  For example, in Sabri v. United States, Justice Souter carefully articulates the connection between Congress' Spending Clause power, see U.S. Const. art. I, § 8,

---

cl. 1, and a statute that makes it a federal crime to bribe state, local, or tribal officials if the state, locality, or tribe receives federal funds:

> Congress has authority under the Spending Clause to appropriate federal moneys to promote the general welfare, and it has corresponding authority under the Necessary and Proper Clause to see to it that taxpayer dollars appropriated under that power are in fact spent for the general welfare, and not frittered away in graft or on projects undermined when funds are siphoned off or corrupt public officers are derelict about demanding value for dollars.  Congress does not have to sit by and accept the risk of operations thwarted by local and state improbity.  Section 666(a)(2) addresses the problem at the sources of bribes, by rational means, to safeguard the integrity of the state, local, and tribal recipients of federal dollars.

Sabri v. United States, 541 U.S. at 605 (citations omitted).  The Supreme Court has not, however, always been careful to restrict its analysis to Necessary and Proper Clause legislation's relationship to Congress' enumerated powers -- and not its relationship to Congress' public policy goals.  As an illustration, in United States v. Kebodeaux, 570 U.S. 387 (2013), Justice Breyer quickly outlines the source of Congress' power to impose registration requirements on military sex offenders:

> [U]nder the authority granted to it by the Military Regulation and Necessary and Proper Clauses, Congress could promulgate the Uniform Code of Military Justice.  It could specify that the sex offense of which Kebodeaux was convicted was a military crime under that Code.  It could punish that crime through imprisonment and by placing conditions upon Kebodeaux's release.  And it could make the civil registration requirement at issue here a consequence of Kebodeaux's offense and conviction.

United States v. Kebodeaux, 570 U.S. at 395 (Breyer, J.).  Justice Breyer follows that analysis with a long discussion regarding how "registration requirements applied to federal sex offenders after their release can help protect the public from those federal sex offenders and alleviate public safety concerns."  United States v. Kebodeaux, 570 U.S. at 395.  As Chief Justice Roberts recognized, that discussion regarding "the general public safety benefits of the registration requirement" is entirely "beside the point."  United States v. Kebodeaux, 570 U.S. at 399 (Roberts, C.J., concurring in judgment).  In the Chief Justice's view, it was enough to say that

> [t]he Constitution gives Congress the power "[t]o make Rules for the Government and Regulation of the land and naval Forces."  And, under the Necessary and Proper Clause, Congress can give those rules force by imposing consequences on members of the military who disobey them.  A servicemember will be less likely to violate a relevant military regulation if he knows that, having done so, he will be required to register as a sex offender years into the future.

United States v. Kebodeaux, 570 U.S. at 400 (Roberts, C.J., concurring in judgment)(alteration in the original)(citations omitted)(quoting U.S. Const. art. I, § 8, cl. 14).  See id., 570 U.S. at 400

Propriety, unlike necessity, has largely escaped judicial scrutiny.  See Gary Lawson &

Patricia B. Granger, The "Proper" Scope of Federal Power: A Jurisdictional Interpretation of the

Sweeping Clause, 43 Duke L.J. 267, 287 (1993)("The word 'proper' has generally been treated as

a constitutional nullity or, at best, as a redundancy.").  In recent years, however, the Supreme Court

has begun to take seriously the notion that laws -- no matter how necessary -- are improper if they

undermine the nation's constitutional structure.  See Printz v. United States, 521 U.S. 898

(1997)(concluding that a law carrying the Commerce Clause into execution is not proper, for

Necessary and Proper Clause purposes, if it "violates the principles of state sovereignty" that

various other constitutional provisions reflect); Sebelius, 567 U.S. at 559 (opinion of Roberts,

C.J.)(declaring that "laws that undermine our structure of government established by the

Constitution" are not a proper means for carrying Congress' enumerated powers into execution);

---

("The majority says, more or less, the same thing.").  According to the Chief Justice, the public
policy "consequences of the registration requirement are irrelevant for our purposes," because

> [p]ublic safety benefits are neither necessary nor sufficient to a proper exercise of
> the power to regulate the military.  What matters -- all that matters -- is that
> Congress could have rationally determined that "mak[ing] the civil registration
> requirement at issue here a consequence of Kebodeaux's offense" would give force
> to the Uniform Code of Military Justice adopted pursuant to Congress's power to
> regulate the Armed Forces.
>
> Ordinarily such surplusage might not warrant a separate writing.  Here,
> however, I worry that incautious readers will think they have found in the majority
> opinion something they would not find in either the Constitution or any prior
> decision of ours: a federal police power.

United States v. Kebodeaux, 570 U.S. at 401-02 (Roberts, C.J., concurring in judgment)(second
alteration in the original)(citation omitted)(quoting United States v. Kebodeaux, 570 U.S. at 395
(Breyer, J.)).  Chief Justice Roberts' analysis persuades the Court that Justice Breyer's discussion
regarding public safety is a non sequitur, and not an indication that Congress can enact legislation
under the Necessary and Proper Clause just because that legislation furthers public safety or some
other worthy policy goal.

id. 567 U.S. at 653 (joint opinion of Scalia, Kennedy, Thomas, and Alito, JJ.)("[T]he scope of the Necessary and Proper Clause is exceeded not only when the congressional action directly violates the sovereignty of the States but also when it violates the background principle of enumerated (and hence limited) federal power.").  Laws that undermine constitutional structures do not "consist with the . . . spirit of the constitution," so Congress' Necessary and Proper Clause power does not permit it to adopt such laws.  McCulloch v. Maryland, 17 U.S. (4 Wheat) at 421.

## ANALYSIS

The Court will deny Gross' Motion to Dismiss, because United States v. Sack is binding Tenth Circuit precedent which holds that a person can be charged with escape from pretrial custody while residing at a halfway house. 379 F.3d 1177.  The Court also concludes that the Tenth Circuit correctly decided United States v. Sack.  379 F.3d 1177.  Finally, the Court concludes that the escape statute, 18 U.S.C. § 751, is constitutional.

**I.  THE COURT WILL DENY GROSS' MOTION TO DISMISS, BECAUSE UNITED STATES V. SACK IS BINDING TENTH CIRCUIT PRECEDENT, AND THE TENTH CIRCUIT CORRECTLY DECIDED UNITED STATES V. SACK.**

Gross asks that the Court dismiss the Indictment charging him with escape, because, he argues, he was not in custody by virtue of the escape statute, 18 U.S.C. § 751.  United States v. Sack is binding Tenth Circuit precedent holding that a person ordered to a halfway house on pretrial release can be charged with escape, and it binds the Court in this case.  Gross argues, however, that United States v. Sack is wrong for three reasons. 379 F.3d 1177.  First, Gross argues that, in United States v. Sack, the Tenth Circuit misinterprets the phrase "'by virtue of any process issued under the laws of the United States.'"  Motion to Dismiss Memo. at 4 (quoting 18 U.S.C. § 751(a)); 379 F.3d 1177.  Second, Gross argues that the Tenth Circuit's conclusion that the defendant in United States v. Sack was in custody is incorrect, and that neither Sack nor Gross

were in custody as 18 U.S.C. § 751(a) uses the term.  See Motion to Dismiss Memo. at 5; 379 F.3d 1177.  Third, Gross argues that United States v. Sack's holding is fundamentally unfair.  See Motion to Dismiss Memo. at 9.  The Court will not dismiss Count II of the Indictment, because United States v. Sack is binding precedent on the Court, and Gross absconded from La Pasada Halfway House after Magistrate Judge Robbenhaar ordered him there on pretrial release.  379 F.3d 1177.  Additionally, the Court disagrees with Gross' arguments that the Tenth Circuit decided wrongly United States v. Sack, because the Tenth Circuit reads correctly the plain language of the phrase "by virtue of any process issued under the laws of the United States," 18 U.S.C. § 751(a), because the Tenth Circuit holds correctly that the term custody does not require physical confinement for § 751(a)'s purposes, see 379 F.3d 1177, and because United States v. Sack's conclusion is not fundamentally unfair.

The escape statute, 18 U.S.C. § 751(a), states:

> Whoever escapes or attempts to escape from the custody of the Attorney General or his authorized representative, or from any institution or facility in which he is confined by direction of the Attorney General, or from **any custody under or by virtue of any process issued under the laws of the United States by any court, judge, or magistrate judge, or from the custody of an officer or employee of the United States pursuant to lawful arrest**, shall, if the custody or confinement is by virtue of an arrest on a charge of felony, or conviction of any offense, be fined under this title or imprisoned not more than five years, or both; or if the custody or confinement is for extradition, or for exclusion or expulsion proceedings under the immigration laws, or by virtue of an arrest or charge of or for a misdemeanor, and prior to conviction, be fined under this title or imprisoned not more than one year, or both.

18 U.S.C. § 751(a)(emphasis added).  Congress enacted the first iteration of the escape statute in 1930, and the original version of the statute stated only:

> Any person properly committed to the custody of the Attorney General or his authorized representative or who is confined in any penal or correctional institution, pursuant to the direction of the Attorney General, who escapes or attempts to escape therefrom shall be guilty of an offense in any United States court shall be punished

> by imprisonment for not more than five years, such sentence to begin upon the expiration of or upon legal release from the sentence for which said person was original confined.

Act of May 14, 1930 § 9, 46 Stat 325, 327, codified as amended at 18 U.S.C. § 751.  That is, the original escape statute criminalized only: "(1) escapes from the custody of the attorney general or his authorized representative and (2) escapes from penal or correctional institutions."  Mica Moore, Escaping from Release: Is Supervised Release Custodial Under 18 USC § 751(a)?, 83 U. Chi. L. Rev. 2257, 2287 (2016).  Five years later, Congress amended the escape statute, "creating two new custodial categories in addition to the two existing categories": (i) custody by virtue of any process issued under the laws of the United States by any court, judge, or commissioner; and (ii) custody of federal officers pursuant to lawful arrests.  Moore, Escaping from Release: Is Supervised Release Custodial Under 18 USC § 751(a)?, at 2287, supra, at 25; Act of Aug 3, 1935, 49 Stat 513, 513-14, codified as amended at 18 U.S.C. § 751.  Notably, the 1935 amended escape statute's legislative history suggests that the amendments were meant to criminalize escape of people in lawful pretrial custody before conviction of a criminal offense.  See Moore, Escaping from Release: Is Supervised Release Custodial Under 18 USC § 751(a)?, supra, at 25 (citing Escape from Custody prior to Conviction, H.R. Rep. No. 74-803, 74th Cong, 1st Sess. 1 (1935)("The purpose of H. R. 3430 is to make escape or attempted escape from custody under lawful arrest before conviction a criminal offense.") and Administration of Federal Prisons, HR Rep No. 74-1021, 74th Cong. 1st Sess. 1 (1935)("I feel that prisoners who are held in lawful custody, even before should likewise be subject to punishment if they escape or attempt to escape.")).[6]  Two

---

[6]In Escaping from Release: Is Supervised Release Custodial Under 18 USC § 751(a)?, at 2287, supra, at 25, Moore opines on 18 U.S.C. § 751(a)'s application to defendants on supervised release.  See Escaping from Release: Is Supervised Release Custodial Under 18 USC § 751(a)?, at 2287, supra, at 25.  Moore notes that 18 U.S.C. § 751(a)'s legislative history indicates that

Courts of Appeals have dealt with the issue whether a person ordered to pre-trial custody in a

halfway house can be charged with escape: the Ninth Circuit and the Tenth Circuit.

_____

Congress intended to criminalize escape from pretrial custody, but that § 751(a) should be read narrowly with respect to supervised release violations. See Escaping from Release: Is Supervised Release Custodial Under 18 USC § 751(a)?, at 2288, supra, at 25. Moore argues that, "unlike a prisoner or an arrestee, a defendant on release is essentially at liberty, having completed a preceding prison term." Escaping from Release: Is Supervised Release Custodial Under 18 USC § 751(a)?, at 2291, supra, at 25. Moore also notes that, unlike the concerns of a prisoner or arrestee leaving or escaping custody, the harms caused by a person already released from prison and serving time on supervised release leaving or escaping court ordered custody are more speculative. See Escaping from Release: Is Supervised Release Custodial Under 18 USC § 751(a)?, at 2291, supra, at 25. Moreover, supervised release is meant to be rehabilitative, rather than punitive. See Escaping from Release: Is Supervised Release Custodial Under 18 USC § 751(a)?, at 2291, supra, at 25. Moore notes, therefore, the paradox of charging a person on supervised release with escape: "[S]upervised release requires judges to integrate formerly incarcerated persons into the wider community; escape is designed to punish offenders for the risks that they present to the public when they abscond from seclusion or resist lawful proceedings." Escaping from Release: Is Supervised Release Custodial Under 18 USC § 751(a)?, at 2292, supra, at 25. Moore's argument supports the Tenth Circuit's conclusion that escape from a halfway house on pretrial release properly falls within the conduct that § 751(a) criminalizes, and that there are legitimate reasons to punish a defendant who disrupts the smooth operation of the criminal justice system, but attempts to call into question the firmness of several Courts of Appeals' rulings on § 751(a)'s application to supervised release violations, discussed infra, at 31-35. See United States v. Sack, 379 F.3d 1177. Namely, Moore criticizes § 751(a)'s application to violations of supervised release as "doubling the penalties that ex-offenders face for violating the terms of their release, trapping individuals who are not truly reoffending in a cycle of imprisonment," Escaping from Release: Is Supervised Release Custodial Under 18 USC § 751(a)?, at 2297, supra, at 25, and argues that an "expansive understanding of escape will increase the length and punitiveness of prison sentences, turning supervised release from a tool to facilitate reentry into a powerful new driver of incarceration," Escaping from Release: Is Supervised Release Custodial Under 18 USC § 751(a)?, at 2259, supra, at 25, without serving a legitimate protective purpose to society. The Court shares Moore's concerns with § 751(a)'s unbridled application to certain supervised release violations, but that issue is not before the Court here, and her policy arguments run head long into the statute's plain language, which provides a solid basis for the Court of Appeals' decisions that she is criticizing; here, policy arguments are directed more properly to Congress than the courts, which faithfully must apply a broad federal escape statute. Also, her arguments should counsel federal prosecutors to be slow to bring escape charges in the supervised release context, except in the most egregious conduct, such as when the defendant commits more serious crimes when on supervised release. In the routine cases, however, the Court has ample tools to deal with the multi-faceted conduct that comes up on supervised release. Moore's argument provides additional thoughtful support for § 751(a)'s application to a defendant absconding from a halfway house on pretrial release.

In United States v. Baxley, 982 F.2d 1265 (9th Cir. 1992), the Ninth Circuit concludes that the defendant, Freeman Baxley, was not in custody for § 751(a)'s purposes. See United States v. Baxley, 982 F.2d at 1269. The district court released Baxley after his arrest, and one of his release conditions required him to reside at a halfway house. See 982 F.2d at 1269. The Ninth Circuit concludes that Baxley was not in custody for § 751(a)'s purposes, because "of the circumstances of his residence at the half-way house," which more closely resembles a conditional release from incarceration, such as probation, than custodial incarceration. United States v. Baxley, 982 F.2d at 1270. Moreover, the Ninth Circuit relies on the district court's "Order Setting Conditions of Release" to conclude that the Order "clearly indicates that Baxley was not intended to be 'in custody' while in residence" at the halfway house. 982 F.2d at 1270 (no citation for quotation). Namely, the Order contains a variety of release conditions, and the district court judge "checked only the boxes that required Baxley to engage in particular actions.[] The district judge did *not* check the box that stated that 'the defendant is placed in the custody of' a given institution." 982 F.2d at 1270 (no citation for quotation)(footnote omitted)(emphasis in original). Consequently, the Ninth Circuit concludes that the district court Order's requirement that Baxley reside in a halfway house does not render him in custody for § 751's purposes. See United States v. Baxley, 982 F.2d at 1270.

Similarly, in United States v. Sack, the district court ordered the defendant, Courtney David Sack, to reside at a halfway house on pretrial release after he was arrested for bank robbery. See 379 F.3d at 1177. One day, Sack failed to return to the halfway house, and the United States charged Sack with both bank robbery and escape. See 379 F.3d at 1177-78. Sack moved to dismiss the escape charge, and the district court denied his motion. See 379 F.3d at 1178. Sack pled guilty to the charge but reserved his right to appeal the district court's denial of his motion to dismiss the

escape charge.  See 379 F.3d at 1178.  Sack appealed the motion's denial to the Tenth Circuit, arguing that, when he was at the halfway house, he was not in custody for purposes of the escape statute, 18 U.S.C. § 751(a), because he was not in the Attorney General's custody, which, he argues, the statute requires.  See 379 F.3d at 1178.  First, the Tenth Circuit notes that, in United States v. Swanson, 253 F.3d 1220 (10th Cir. 2001), the Tenth Circuit concludes that court-ordered residence at a halfway house constitutes custody for the Sentencing Guidelines' purposes.  United States v. Swanson, 253 F.3d 1223-24.  Moreover, the Tenth Circuit considers its previous ruling in United States v. Depew, 977 F.2d 11412 (10th Cir. 1992), which concludes that

> "the statute applies only to those escapees who were originally confined or in custody under federal law in the sense that they were held in the custody of the Attorney General or *in custody by an order or process issued under the laws of the United States by a competent court or official*."

United States v. Sack, 379 F.3d at 1179 (quoting United States v. Depew, 977 F.2d at 1413)(emphasis in United States v. Sack only).  The Tenth Circuit also notes that, for the escape statute's purposes, custody may be minimal or constructive, and does not need to include physical restraint.  See United States v. Sack, 379 F.3d at 1179 (citing United States v. Depew, 977 F.2d at 1413).  The Tenth Circuit analyzes and rejects Sack's argument that custody, for § 751's purposes, requires that a person be in the Attorney General's custody, because the Tenth Circuit concludes that the "or" in § 751 is disjunctive, which makes the beginning of the statute distinct from the preceding phrase.  See 379 F.3d at 1181.  The Tenth Circuit concludes, therefore, that it is not necessary for a defendant to be in the Attorney General's custody to be charged with escape. United States v. Sack, 379 F.3d at 1181.  The Tenth Circuit ultimately states: "Because Sack was in the custody of the halfway house as a result of an order of the district court, we conclude he was in custody under § 751."  379 F.3d at 1179.  See United States v. Mike, 596 F. App'x 692, 695

(10th Cir. 2014)(unpublished)[7](restating United States v. Sack's holding that a halfway house constitutes custody for § 751's purposes and concluding that "Sack was rightly decided").

Subsequently, in United States v. Burke, 790 F. Supp. 2d 1272 (E.D. Wa. 2011)(Shea, J.), aff'd 694 F.3d 1062 (9th Cir. 2012), the Honorable Edward F. Shea, United States District Judge in the United States District Court for the Eastern District of Washington, considers whether a defendant residing at a residential reentry center on supervised release, pursuant to a court order, could be charged with escape.  See United States v. Burke, 790 F. Supp.2d at 1273.  Judge Shea concludes that, in United States v. Sack, the Tenth Circuit interprets "custody too broadly for purposes of § 751(a)."  United States v. Burke, 790 F. Supp. 2d at 1275 (Shea, J.).  Judge Shea states: "An individual who is on release, either pretrial or post-imprisonment, enjoys much more liberty than an individual who is in traditional custody, even if that individual must reside in a halfway house."  790 F. Supp. 2d at 1275.  The Ninth Circuit affirmed Judge Shea's decision, 694 F.3d 1062 (9th Cir. 2012), relying on United States v. Baxley, and concluding that the defendant was not in custody when he was in a residential reentry center while on supervised release.  See United States v. Burke, 694 F.3d at 1063-65 ("Like an individual on probation, Burke was

---

[7]United States v. Mike is an unpublished opinion, but the Court can rely on an unpublished United States Court of Appeals for the Tenth Circuit opinion to the extent that its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that United States v. Mike and United States v. Croxford, 170 F. App'x 31 (10th Cir. 2006), have persuasive value with respect to a material issue and will assist the Court in its disposition of this MOO.

conditionally released from incarceration; his failure to return to [Spokane Residential Reentry Center] was a violation of his release conditions punishable by revocation of release, not an escape from 'custody' within the meaning of § 751(a).")(no citation for quotation).  The Ninth Circuit also affirmed its holding in United States v. Baxley, stating: "We have . . . held that a defendant released on a personal recognizance bond and ordered by a court to reside at a halfway house pending trial is not in 'custody' for purposes of that statute."  United States v. Burke, 694 F.3d at 1064 (citing United States v. Baxley, 982 F.2d 1265).

The Tenth Circuit again considered 18 U.S.C. § 751's application in United States v. Foster, 754 F.3d 1186 (10th Cir. 2014).  In United States v. Foster, the defendant, Cheston Jerome Foster, was charged with escape when he left a residential reentry center where he was ordered to reside as a condition of his supervised release.  See 743 F.3d at 1187.  Foster filed a motion to dismiss the indictment for the escape charge, which the district court granted, reasoning, in relevant part, that there were three distinct issues related to the use of the term custody in § 751(a):

> "(1) the extent and scope of restraints on liberty necessary to constitute 'custody' for purposes of § 751(a); (2) whether someone other than the Attorney General (or his representative) can be a 'custodian' of a person charged with escaping custody; and (3) whether the underlying purpose of a restraint on liberty is custodial."

743 F.3d at 1188 (quoting Appendix at 85).  On appeal, the Tenth Circuit analyzes the legal interpretation of custody, as § 751(a) defines that term.  See 743 F.3d at 1188.  First, the Tenth Circuit concludes that custody need not require physical restraint, and that custody can be minimal and constructive.  See 743 F.3d at 1189.  Moreover, the Tenth Circuit cites United States v. Sack to note that a person need not be in the Attorney General's custody to be charged with escape.  See 743 F.3d at 1190.  After rejecting Foster's arguments that § 751(a) is unconstitutionally vague and that the court should apply the rule of lenity, the Tenth Circuit concludes that Foster properly could

be charged with escape, and reverses the district court's dismissal of the indictment.  See 743 F.3d at 1194.

While the Ninth Circuit and the Tenth Circuit are the only two Courts of Appeals to have opined directly on the issue before the Court -- whether a person can be charged with escape while on pretrial release -- several other courts have analyzed 18 U.S.C. § 751, and those analyses are relevant to the question presented here.  In United States v. Evans, 159 F.3d 908 (4th Cir. 1998), the United States Court of Appeals for the Fourth Circuit considers whether the United States properly charged the defendant, Robert Vaughn Evans, with escape, where Evans was transported to the United Hospital Center after suffering a seizure in jail, and Evans subsequently "escaped from the United Hospital Center while pretending to take a shower."  159 F.3d at 910.  Evans was convicted of escape, in violation of 18 U.S.C. § 751(a).  See 159 F.3d at 910.  On appeal, Evans "challenge[d] the sufficiency of the evidence to support his § 751(a) conviction."  159 F.3d at 910.  The Fourth Circuit outlines what the United States needs to prove in order to sustain a § 751(a) conviction:

> Section 751(a) requires the government to prove three elements. First, the government must satisfy § 751(a)'s custody/confinement requirement.  The government can meet this burden by demonstrating that the defendant was (1) in the custody of the Attorney General or her authorized representative; (2) confined in an institution by direction of the Attorney General; (3) in custody under or by virtue of any process issued under the laws of the United States by any court, judge, or magistrate; or (4) in the custody of an officer or employee of the United States pursuant to a lawful arrest. Second, the government must satisfy § 751(a)'s offense requirement.  To meet this burden, the government must demonstrate that the defendant's custody or confinement was by virtue of an arrest on a felony crime or a conviction for any offense.  Finally, the government must prove that the defendant escaped from such custody or confinement.  Although the term "escape" is not defined in § 751(a), the government meets its burden if it demonstrates that the defendant "absent[ed]" himself "from custody without permission." *United States v. Bailey*, 444 U.S. 394, 407 . . . (1980).

159 F.3d at 910.  Evans first argued that he was not in custody as § 751 defines the term, because

he was in State custody at the time he absconded, and, thus, he was not in the "custody of the Attorney General."  159 F.3d at 910-11.  The Fourth Circuit notes that Congress did not intend § 751 to apply only to people who escape from State custody, and that Congress intended it to apply to "'those escapees who were originally confined or in custody under federal law in the sense that they were held in custody of the Attorney General or in custody by an order or process issued under the laws of the United States by a competent court or official.'"  159 F.3d at 911 (quoting United States v. Howard, 654 F.2d 522, 525 (8th Cir. 1981)).  The Fourth Circuit also states that "'custody' does not require actual physical restraint."  159 F.3d at 911 (no citation for quotation).  The Fourth Circuit ultimately concludes that Evans was in the Attorney General's custody when he escaped, and, thus, his § 751(a) conviction is proper.  159 F.3d at 911.

Similarly, in United States v. Goad, 788 F.3d 873 (8th Cir. 2015), the United States Court of Appeals for the Eighth Circuit considers whether the defendant, Jamie Goad, could be convicted of escape under § 751, where Goad absconded from a residential reentry center while on supervised release.  See 788 F.3d at 874.  Goad appealed his conviction, arguing that "§ 751(a) does not criminalize his abscondence because he was not in 'custody' while residing" at the residential reentry center.  788 F.3d at 874 (no citation for quotation).  At the outset, the Eighth Circuit notes:

> "[A] person may be in custody for purposes of § 751(a) even though the physical restraints upon him are minimal and even though the custody be deemed constructive, rather than actual."  *United States v. Cluck*, 542 F.2d 728, 736 (8th Cir. 1976).  And "it is not necessary . . . that the escape be from a conventional penal housing unit such as a cell or cell block."  *Id.* at 731.  "Specifically, the escape may be from a hospital," *id.*, or a pre-release "halfway house," McCullough v. United States, 369 F.2d 548, 549-50 (8th Cir. 1966)[8], "in which the escapee was

---

[8]While the Eight Circuit interprets McCullough v. United States broadly to stand for the proposition that a person may be convicted of escape upon leaving a halfway house, in

properly confined," *Cluck*, 542 F.2d at 731.  *See also United States v. Sack*, 379 F.3d 1177, 1179-80 (10th Cir. 2004)(holding pretrial detainee's court-ordered residency at a halfway house was "custody" under § 751(a)); *United States v. Rudinsky*, 439 F.2d 1074, 1076-77 (6th Cir. 1971)("[I]t is apparent that the Treatment Center's restrictions [on a pre-release detainee] deprived [the detainee] of his freedom of movement and association. He was therefore in custody within the purview of 18 U.S.C. § 751." (citing *McCullough*, 369 F.2d 548)).

788 F.3d at 875.  The Eighth Circuit rejects Goad's argument that he could not be charged with escape, because his conditions of release in the residential reentry center were less custodial than those of a prison or jail setting.  See 788 F.3d at 875-76.  Indeed, the Eighth Circuit emphasized:

> The statute broadly covers "any custody under or by virtue of any process issued under the laws of the United States by any court, judge, or magistrate judge."  18 U.S.C. § 751(a) (emphasis added); *see also United States v. Edelman*, 726 F.3d 305, 309 (2d Cir. 2013)(noting the breadth and clarity of this language); *Sack*, 379 F.3d at 1179-80 ("[B]ecause the plain language of the statute allows for a charge of escape based on 'any custody' resulting from a court order there is no reason to conclude that a defendant must be in the custody of the Attorney General."). Contrasting this clause with the others in § 751(a), all of which specify the necessary custodian, it becomes all the more clear that the "any custody" clause treats all custodians alike.  The confinement need only be "under or by virtue of any process issued" by a judge or court under federal law.  18 U.S.C. § 751(a); *see also United States v. Foster*, 754 F.3d 1186, 1194 (10th Cir. 2014).

788 F.3d at 876.  The Eighth Circuit concludes that Goad's order to a residential reentry center constitutes confinement under or by virtue of any process issued, and, therefore, that a conviction under 18 U.S.C. § 751 is proper.  See 788 F.3d at 876.  Notably, the Eighth Circuit also states: "We therefore join the Second and Tenth Circuits in rejecting *Burke*'s interpretation and hold that a defendant's unauthorized departure from his residential reentry facility, in violation of both the rules of the facility and the terms of his supervised release, constitute escape from 'custody' within § 751(a)."  788 F.3d at 876.

---

McCullough v. United States, it was undisputed that a person at the halfway house at issue was in the Attorney General's custody.  See 369 F.2d at 550.

In United States v. Edelman, 726 F.3d 305 (2d. Cir. 2013), the United States Court of Appeals for the Second Circuit considers whether the defendant, Jody Edelman, may be charged with escape from a residential reentry center on supervised release.  See 726 F.3d at 306.  On appeal, Edelman argued, first, that his residence at a residential reentry center does not constitute custody, and, second, that his placement in the residential reentry center is not by virtue of a conviction under § 751(a).  See 726 F.3d at 308-09.  The Second Circuit notes that it is "significant that the statute applies to 'any custody,' suggesting that the term 'custody' should have a broad interpretation."  726 F.3d at 309 (citing United States v. Sack, 379 F.3d at 1180).  The Second Circuit agrees with the Tenth Circuit's ruling and reasoning in United States v. Sack, and concludes that the restraint on Edelman's activities is sufficient to constitute custody for § 751(a)'s purposes.  See 726 F.3d at 309-10.  In rejecting Edelman's second argument -- that he was not in custody by virtue of a conviction -- the Second Circuit concludes that Edelman was still in custody by virtue of the conviction that resulted in his placement on supervised release.  See 726 F.3d at 310.  See also United States v. Kelly, 368 F. App'x 194, 197 (2d Cir. 2010)(upholding a defendant's conviction pursuant to 18 U.S.C. § 751 after the defendant escaped from a halfway house).

The United States Court of Appeals for the Sixth Circuit also has analyzed 18 U.S.C. § 751(a).  In United States v. Rudinsky, 439 F.2d 1074 (6th Cir. 1971), the Sixth Circuit considers whether the defendant, James Rudinsky, properly was convicted of escape in violation of § 751(a) when he left the Federal Community Treatment Center in Detroit, Michigan.  See United States v. Rudinsky, 439 F.2d at 1075.  The Sixth Circuit states that Rudinsky was sentenced to five years in prison and that "[a]fter short stays in prisons . . . [he] was transferred to the Federal Community Treatment Center."  439 F.2d at 1075.  The Sixth Circuit does not indicate clearly whether Rudinsky's transfer to the Treatment Center was a part of his term of incarceration or if it occurred

as a part of his supervised release.  See United States v. Rudinsky, 439 F.2d at 1076.  In relevant

part, Rudinsky argued on appeal that he was not in custody for § 751(a)'s purposes at the time he

left the Treatment Center.  See United States v. Rudinsky, 439 F.2d at 1076.  The Sixth Circuit

concludes:

> Although it is true that the appellant was permitted a degree of freedom at the
> Treatment Center, we find that he was still in 'custody' during his term there.  A
> person may still be in custody, even though not under constant supervision of
> guards, so long as there is some restraint upon his complete freedom.  *Read v.
> United States*, 361 F.2d 830 (10th Cir. 1966).

United States v. Rudinsky, 439 F.2d at 1076 (no citation for quotation).  Moreover, the Sixth

Circuit notes that the Treatment Center's restrictions "deprived [Rudinsky] of his freedom of

movement and association."  United States v. Rudinsky, 439 F.2d at 1076.  Consequently, the

Sixth Circuit concludes that Rudinsky was in custody as § 751(a) defines the term and, thus, his

conviction is proper.  United States v. Rudinsky, 439 F.2d at 1076-77.

Having analyzed the opinions of the Second, Fourth, Sixth, Eighth, Ninth, and Tenth

Circuits, the Court concludes that the Tenth Circuit decided correctly United States v. Sack.  Gross

argues that United States v. Sack was decided incorrectly, in part, because it dealt only with the

narrow question whether a person could be in custody for § 751(a)'s purposes if he was not in the

Attorney General's custody.   See Motion to Dismiss Memo. at 4-5.  Gross ultimately

acknowledges, however, that the Tenth Circuit is correct in its conclusion that "a person can escape

without being in the custody of the Attorney General," Motion to Dismiss Memo. at 5, but argues

that none of those opinions, including United States v. Sack, "explain what exactly is meant 'by

virtue of any process issued under the laws of the United States,'" Motion to Dismiss Memo. at 5

(quoting 18 U.S.C. § 751(a)).  Specifically, Gross argues that the Tenth Circuit expands the

definition of the word custody and "misinterprets the essential language in the custody statute."

Motion to Dismiss Memo. at 5.  The Court disagrees with Gross' assertion that the Tenth Circuit misinterprets the escape statute.  See United States v. Sack, 379 F.3d 1177.  First, the plain reading of the escape statute -- that "whoever escapes . . . from any custody under or by virtue of any process issued under the laws of the United States" -- is that a person who escapes from any custody that legitimately is ordered, by a process under the laws of the United States, can be charged with escape.  18 U.S.C. § 751(a).  Here, Magistrate Judge Robbenhaar set a Release Condition for Gross that states:

> The defendant is placed in the custody of: La Pasada Halfway House . . . who agrees to (a) supervise the defendant, (b) use every effort to assure the defendant's appearance at all court proceedings, and (c) notify the court immediately if the defendant violates a condition of release or is no longer in the **custodian's custody**.

Release Conditions ¶ 6, at 2 (emphasis added).  Moreover, 18 U.S.C. § 3141 provides that a "judicial officer of a court of original jurisdiction over an offense . . . shall order that, pending imposition or execution of sentence, or pending appeal of conviction or sentence, a person be released or detained under this chapter."  18 U.S.C. § 3141.  18 U.S.C. § 3142 provides four options for a judicial officer:

> Upon the appearance before a judicial officer of a person charged with an offense, the judicial officer shall issue an order that, pending trial, the person be --
>
> (1)   released on personal recognizance or upon execution of an unsecured appearance bond, under subsection (b) of this section;
>
> (2)   released on a condition or combination of conditions under subsection (c) of this section;
>
> (3)   temporarily detained to permit revocation of conditional release, deportation, or exclusion under subsection (d) of this section; or
>
> (4)   detained under subsection (e) of this section.

18 U.S.C. § 3142(a).  The statute goes on to provide that,

> subject to the least restrictive further condition, or combination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community, which may include the condition that the person --
>
> > (i)    remain in the custody of a designated person, who agrees to assume supervision and to report any violation of a release condition to the court, if the designated person is able reasonably to assure the judicial officer that the person will appear as required and will not pose a danger to the safety of any other person or the community; . . . .

18 U.S.C. § 3142(c)(1)(B)(i).  A judicial officer is "any person or court authorized pursuant to section 3041 of this title, or the Federal Rules of Criminal Procedure, to detain or release a person before trial or sentencing or pending appeal in a court of the United States," 18 U.S.C. § 3156(a)(1), and 18 U.S.C. § 3041 provides:

> For any offense against the United States, the offender may, by any justice or judge of the United States, or by any United States magistrate judge, or by any chancellor, judge of a supreme or superior court, chief or first judge of the common pleas, mayor of a city, justice of the peace, or other magistrate, of any state where the offender may be found, and at the expense of the United States, be arrested and imprisoned or released as provided in chapter 207 of this title, as the case may be, for trial before such court of the United States as by law has cognizance of the offense.

18 U.S.C. § 3041.   The Court concludes, therefore, that the "laws of the United States" properly allow a Magistrate Judge to order a pretrial defendant to a halfway house's custody, and that this circumstance falls within the plain meaning of the phrase "by virtue of any process issued under the laws of the United States."  18 U.S.C. § 751(a).  In United States v. Sack, the Tenth Circuit does not interpret expressly this phrase, but notes that "it is the contrast between this phrase and the rest of the statute created by the disjunctive 'or' beginning the quote which makes the meaning of the phrase distinct from the preceding phrase."  379 F.3d at 1181.  That is, the Tenth Circuit

notes that the "or" in 18 U.S.C. § 751(a) makes distinct the phrases "custody of the Attorney General" and "or by virtue of any process issued under the laws of the United States." 18 U.S.C. § 751(a). See United States v. Sack, 379 F.3d at 1181. The Court agrees with the Tenth Circuit's conclusion that the disjunctive "or" renders these two phrases distinct, and concludes that a person ordered to a halfway house by a district court or magistrate judge is in custody for 18 U.S.C. § 751(a)'s purposes. This conclusion also follows from the 18 U.S.C. § 751(a)'s legislative history, which indicates that Congress amended the statute to include the class of people who leave pretrial custody. See Act of Aug 3, 1935, 49 Stat 513, 513-14, codified as amended at 18 U.S.C. § 751.

Next, Gross argues that it does not follow that a person "*released* to a halfway house is in custody," Motion to Dismiss Memo. at 5 (emphasis in original), because a person "*released* to a halfway house is not in physical custody," Motion to Dismiss Memo. at 7. The Court disagrees with Gross' argument. In United States v. Sack, the Tenth Circuit relies on its prior holdings in United States v. Swanson and United States v. Depew and concludes soundly that custody need not include physical restraint. See United States v. Sack, 379 F.3d at 1179 (citing United States v. Swanson, 253 F.3d at 1223-24, and United States v. Depew, 977 F.2d at 1413). See also United States v. Foster, 754 F.3d at 1188 (concluding that custody can be minimal and constructive, and does not require physical restraint). For example, the Tenth Circuit unequivocally states in United States v. Depew that "'[c]ustody', as used in the escape statute, does not require direct physical restraint." 977 F.2d 1412 (citing United States v. Keller, 912 F.2d 1058 (9th Cir. 1990)). Moreover, several other Courts of Appeals conclude that custody does not require physical confinement. See United States v. Goad, 788 F.3d at 875 ("'[I]t is not necessary . . . that the escape be from a conventional penal housing unit such as a cell or cell block.'")(quoting United States v.

Cluck, 542 F.2d at 736); United States v. Edelman, 726 F.3d at 309-10 (concluding that restraint on activities is sufficient to constitute custody for § 751(a)'s purposes; United States v. Evans, 159 F.3d at 911 ("'[C]ustody' does not require actual physical restraint.")(no citation for quotation); United States v. Leonard, 498 F.2d 754, 756 (D.C. Cir. 1974)("'Stone walls do not a prison make' and 'custody' in the escape statute is not restricted in its meaning to escape from immediate confinement within prison walls.")(no citation for quotation).  Consequently, the Court concludes that Gross' argument that he was "*released*" to a halfway house is inapposite, because, even though Gross may have been released from physical custody, he remained in the United States' custody "by virtue of any process issued under the laws of the United States," 18 U.S.C. § 751(a), when Magistrate Judge Robbenhaar ordered Gross to reside at La Pasada as a term of his pretrial release, see Release Conditions ¶ 6, at 2.

Finally, Gross argues that it is fundamentally unfair that an individual who cannot receive credit towards a future sentence for pre-conviction time spent at a halfway house nevertheless can be convicted of escaping the halfway house.  See Motion to Dismiss Memo. at 7.  When the Court first saw the United States charging Gross with escape from a pretrial halfway house, the Court had the same reaction that Gross has.  Defense attorneys often want their clients at the halfway house for a variety of reasons, such has having easy access to them close by in Albuquerque rather traveling further to a large detention facility, but everyone understands that the defendant is not receiving credit.  Sometimes a defendant and defense counsel make a decision to forego a halfway house for that very reason, particularly when the evidence against a defendant is strong.

On sober reflection, the Court realizes that the escape statute serves different purposes than the statute prescribing when the Bureau of Prisons can award an inmate credit for time spent in official detention.  See 18 U.S.C. § 3585.  Congress can criminalize an action that interferes with

the orderly operation of the criminal justice system, even if proper conduct does not get the defendant anything more than staying out of further trouble; Congress does not have to treat this conduct symmetrically.  The escape statute's purpose is to criminalize a person leaving custody, which is disruptive to judicial proceedings, a community's safety, and the security of a facility, while the statute detailing a person's time-served credit serves only to consider whether a person has served time in "official detention," that is, conditions similar to incarceration.  18 U.S.C. § 3585.  See Reno v. Koray, 515 U.S. 50, 57 (1995)(interpreting 18 U.S.C. § 3585 as requiring only that a defendant receive credit for time spent in detention rather than on pretrial release).  See also United States v. Sack, 379 F.3d at 1179 (noting that the Supreme Court was interpreting 18 U.S.C. § 3585's language, and its interpretation of § 3585 is not parallel to 18 U.S.C. § 751(a)).  The Court concludes, therefore, that 18 U.S.C. § 751 is not fundamentally unfair simply because a defendant may be charged with escape even though they cannot receive time-served credit towards a sentence of incarceration.  Accordingly, the Court denies Gross' Motion to Dismiss the Indictment, because United States v. Sack is binding Tenth Circuit precedent on the Court, the Court concludes that, in any event, the Tenth Circuit correctly decided United States v. Sack, and criminalizing escape from pretrial release is not fundamentally unfair.  379 F.3d 1177.

## II.   THE COURT WILL DENY GROSS' MOTION TO DISMISS, BECAUSE 18 U.S.C. § 751 IS CONSTITUTIONAL.

Gross also argues that United States v. Sack is "a judicial expansion of jurisdiction that violates the Commerce Clause."  Motion to Dismiss Memo. at 8.  Gross argues that United States v. Sack is akin to United States v. Lopez, 514 U.S. 549 (1995), in which the Supreme Court struck down a law that made it a crime for a person to possess a firearm within a school zone, because the statute did not affect substantially interstate commerce and, therefore, Congress does not have

the authority under the Commerce Clause to enact the law.  See United States v. Lopez, 514 U.S. at 558-59.   See also United States v. Croxford, 170 F. App'x 31 (10th Cir. 2006)(unpublished)(concluding that Congress enacted properly 18 U.S.C. § 2251, criminalizing the sexual exploitation of children, because the sexual exploitation of children substantially affects interstate commerce).   The United States argues, however, that 18 U.S.C. § 751(a) is not a law that Congress enacted pursuant to the Commerce Clause, but that 18 U.S.C. § 751(a) "arises from Congress's derived power (via the Necessary and Proper Clause) to enact laws dealing with the federal criminal justice system itself -- that is, it's a law that prevents people in custody from escaping from that system."  Response at 15.  The Court agrees with the United States that Congress does not get its power to enact 18 U.S.C. § 751(a) from the Commerce Clause, but that 18 U.S.C. § 751(a) is necessary and proper to Congress' power to regulate federal custody and prisons.  The Court also agrees, therefore, that United States v. Sack does not constitute an unconstitutional "judicial expansion of jurisdiction."  Motion to Dismiss Memo. at 8.

In United States v. Comstock, 560 U.S. 126 (2010), the Supreme Court holds that the Necessary and Proper Clause, U.S. Const. art. I, § 8, gives Congress broad authority to enact laws in the course of executing the enumerated powers the Constitution vests in Congress.  See United States v. Comstock, 560 U.S. at 135.  The Supreme Court also states that

> the Constitution, which nowhere speaks explicitly about the creation of federal crimes beyond those related to "counterfeiting," "[t]reason," or "Piracies and Felonies committed on the high Seas" or "against the Law of Nations," Art. I, § 8, cls. 6, 10; Art. III, § 3, nonetheless grants Congress broad authority to create such crimes.

United States v. Comstock, 560 U.S. at 135-36.  The Supreme Court provides numerous examples of Congress' proper exercise of its power to enact laws:

> Congress routinely exercises its authority to enact criminal laws in furtherance of,

for example, its enumerated powers to regulate interstate and foreign commerce, to enforce civil rights, to spend funds for the general welfare, to establish federal courts, to establish post offices, to regulate bankruptcy, to regulate naturalization, and so forth. Art. I, § 8, cls. 1, 3, 4, 7, 9; Amdts. 13-15. *See, e.g., Lottery Case,* supra (upholding criminal statute enacted in furtherance of the Commerce Clause); *Ex parte Yarbrough,* 110 U.S. 651 . . . (1884)(upholding Congress' authority to enact Rev. Stat. § 5508, currently 18 U.S.C. § 241 (criminalizing civil-rights violations) and Rev. Stat. § 5520, currently 42 U.S.C. § 1973j (criminalizing voting-rights violations) in furtherance of the Fourteenth and Fifteenth Amendments); *Sabri* [*v. United States,* 541 U.S. 600 (2004)](upholding criminal statute enacted in furtherance of the Spending Clause); *Jinks* [*v. Richland Cnty., S.C.,* 538 U.S. 456,] 462, n.2 [(2003)] . . . (describing perjury and witness tampering as federal crimes enacted in furtherance of the power to constitute federal tribunals (citing *McCulloch* [*v. Maryland,* 17 U.S. 316,] . . . 417)); *see also* 18 U.S.C. § 1691 et seq. (postal crimes); § 151 et seq. (bankruptcy crimes); 8 U.S.C. §§ 1324-1328 (immigration crimes).

United States v. Comstock, 560 U.S. at 170 (alterations added).  Notably, the Supreme Court also

specifically explains Congress' power to enact laws governing prisoners and prisons:

Congress, in order to help ensure the enforcement of federal criminal laws enacted in furtherance of its enumerated powers, "can cause a prison to be erected at any place within the jurisdiction of the United States, and direct that all persons sentenced to imprisonment under the laws of the United States shall be confined there." *Ex parte Karstendick,* 93 U.S. 396 . . . (1876).  Moreover, Congress, having established a prison system, can enact laws that seek to ensure that system's safe and responsible administration by, for example, requiring prisoners to receive medical care and educational training, *see, e.g.,* 18 U.S.C. §§ 4005-4006; § 4042(a)(3), and **can also ensure the safety of the prisoners, prison workers and visitors, and those in surrounding communities by, for example, creating further criminal laws governing entry, exit, and smuggling, and by employing prison guards to ensure discipline and security**, *see, e.g.,* § 1791 (prohibiting smuggling contraband); § 751 et seq. (prohibiting escape and abetting thereof); 28 CFR § 541.10 et seq. (2009)(inmate discipline).

Neither Congress' power to criminalize conduct, nor its power to imprison individuals who engage in that conduct, nor its power to enact laws governing prisons and prisoners, is explicitly mentioned in the Constitution.  But Congress nonetheless possesses broad authority to do each of those things in the course of "carrying into Execution" the enumerated powers "vested by" the "Constitution in the Government of the United States," Art. I, § 8, cl. 18 -- authority granted by the Necessary and Proper Clause.

United States v. Comstock, 560 U.S. at 137-38 (emphasis added).  Further, the Tenth Circuit has

noted that, in analyzing whether Congress properly enacted a law, a court should consider "'whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power.'"   United States v. Brune, 767 F.3d 1009, 1016 (10th Cir. 2014)(quoting United States v. Comstock, 560 U.S. at 134).   Moreover, the Tenth Circuit notes that, in United States v. Comstock, "the Supreme Court expressly 'reject[ed] [the criminal defendants'] argument that the Necessary and Proper Clause permits no more than a single step between an enumerated power and an Act of Congress.'"   United States v. Yelloweagle, 643 F.3d 1275, 1285-86 (10th Cir. 2011)(quoting United States v. Comstock, 560 U.S. at 147)(alteration in United States v. Yelloweagle, but not in United States v. Comstock).   Further, in United States v. Yelloweagle, 643 F.3d 1275 (10th Cir. 2011), the Tenth Circuit indicates that there is no reason to "give the Necessary and Proper Clause a stricter construction when reviewing Congress's enactment of criminal provisions." United States v. Yelloweagle, 643 F.3d at 1289.

The Court agrees with the United States that Congress has the authority to enact 18 U.S.C. § 751(a) pursuant to the Necessary and Proper Clause.   In United States v. Comstock, the Supreme Court states that

> Congress has the implied power to criminalize any conduct that might interfere with the exercise of an enumerated power, and also the additional power to imprison people who violate those (inferentially authorized) laws, and the additional power to provide for the safe and reasonable management of those prisons, and the additional power to regulate the prisoners' behavior even after their release.

560 U.S. at 147.   The Supreme Court also indicates that Congress has the authority to create federal prisons to "ensure the enforcement of federal criminal laws enacted in furtherance of its enumerated powers," and, thereby, to enact laws that regulate prisons and ensure their operation, United States v. Comstock, 560 at 136, and that Congress can enact laws governing the entry and exit of prisons, and employment of security guards to "ensure discipline and security," and to

"ensure the safety of . . . those in the surrounding communities," United States v. Comstock at 137. The Court concludes that it necessarily follows from the Supreme Court's decision in United States v. Comstock that Congress acts within its authority to criminalize escape from federal prison, as it ensures prisons' security, communities' safety, and prisons' effective operation.  Congress can enact laws that criminalize conduct pursuant to its enumerated powers, can establish prisons and laws that regulate prisons, and therefore, it follows that Congress can criminalize a person's escape from federal custody.  See United States v. Comstock, 560 U.S. at 148 ("[W]e must reject respondents' argument that the Necessary and Proper Clause permits no more than a single step between an enumerated power and an Act of Congress.").  Consequently, the Court concludes that 18 U.S.C. § 751(a) is constitutional and, accordingly, will deny Gross' Motion to Dismiss.

IT IS ORDERED that: (i) Defendant Dean Gross' Oral Motion to Dismiss Count Two of the Indictment, made at the December 21, 2021, Hearing, see Clerk's Minutes at 3-4, filed December 21, 2021 (Doc. 101), is denied; and (ii) the requests in the Defendant's Memorandum in Support of Oral Motion to Dismiss Count Two of the Indictment, filed January 20, 2021 (Doc. 104), are denied.

UNITED STATES DISTRICT JUDGE

Counsel:

Fred J. Federici
   United States Attorney
Linda Mott
Stephen A. White
   Assistant United States Attorneys
United States Attorney's Office

Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Margaret Katze
  Federal Public Defender
Dennis J. Candelaria
Buck T. Glanz
  Assistant Federal Public Defenders
Federal Public Defender's Office
Albuquerque, New Mexico

    *Attorneys for the Defendant*